**In re FORTUNE SYSTEMS SECURITIES LITIGATION**

**And Related Cases.**

**No. C–83–3348A WHO.**

United States District Court,
N.D. California.

July 6, 1987.

David B. Gold, John W. Allured, San Francisco, Cal., for plaintiffs.

Melvin R. Goldman, Janet M. Cooper, Paul R. Dieseth, Morrison & Foerster, Bruce G. Vanyo, Philip R. Rotner, Douglas Y. Peters, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

There are presently before the Court three motions, plaintiffs' and defendants' cross-motions for partial summary judgment and defendant Fortune Systems Corporation's ("Fortune") motion for judgment on the pleadings. Plaintiff class, purchasers of defendant Fortune's shares made available pursuant to an initial public offering ("IPO") conducted on March 4, 1983,[1] allege in their complaint that defendants, consisting of Fortune, its directors, various institutional shareholders of Fortune stock, and the underwriters of the Fortune IPO,[2] participated in an IPO that contained numerous misrepresentations and omissions, in violation of the federal securities laws, common law fraud and deceit, and common law negligent misrepresentation. All three motions came on for hearing on June 18, 1987, and the Court has had the benefit of the papers submitted in support of and in opposition to the motions, the papers on file, and the oral argument of counsel for all parties. For the reasons following, the Court grants defendants' motion for partial summary judgment, denies plaintiffs' motion for partial summary judgment, and denies defendant Fortune's motion for judgment on the pleadings.

---

1. Plaintiffs are a class of purchasers of Fortune Systems common stock, "who purchased or otherwise acquired [that stock] from March 4, 1983 through June 3, 1983, inclusive." The class was conditionally certified on March 26, 1984. *See* R.T. Mar. 26, 1984, at 2–3, 28, 42.

2. A class of underwriter defendants was conditionally certified for the purposes of litigating plaintiffs' § 11 claims. The class included "all underwriters who, pursuant to a single Underwriting Agreement, participated in the initial registered public offering and sale of Fortune common stock on or about March 4, 1984." *See id.* at 25.

I

The present action arises out of the IPO by Fortune, a computer and software manufacturer, of $110 million worth of its common stock on March 4, 1983. The stock was originally intended to be priced at $16 to $19, and five million shares were to be sold. The purpose of the IPO was to raise money for Fortune's expansion and development. One day before the IPO was to take place, the underwriters hired by Fortune to conduct the IPO decided to raise the price of the shares to $22 per share on the basis of the remarkable success of a similar computer company's IPO a few days earlier. The underwriters failed to give advance warning to the prospective buyers of the raised price of the soon-to-be issued Fortune stock.

The morning of the IPO a few cancellations occurred as a result of the higher price, the most serious being that a major institutional investor backed out of its commitment to buy several thousand shares. This came about because one of the underwriters had made an unsolicited offer of several thousand available shares to an institutional investor on the morning of the IPO. The investor, given the prior assertions by other underwriters of the unavailability of more shares, thereupon suspected the worth of the new issue and balked at the offer, cancelling its original order as well. Declarations of Peter Lebovitz and Robert L. Cooney in Support of Defendants' Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Counter Motion for Partial Summary Judgment (hereinafter "Lebovitz Declaration" and "Cooney Declaration"), filed June 16, 1987. Defendants allege that the information of this cancellation immediately entered into the "market," causing rumors to fly and the "desirability" of the shares to plummet. When the IPO opened on the stock exchange a few hours later, the price started low at $21.50 and fell quickly. Over the next six trading days the price continued to fall, finally settling out at approximately $16 per share. Plaintiffs contest the driving force behind the decline, asserting that the fall in price was occasioned by the "flood" of information in the market concerning the poor quality of Fortune's product, the problems in developing the product, and the dealer and customer dissatisfaction mounting in response to the product. Regardless of the impetus, it is clear that the stock did fall precipitously, and that the IPO was a disaster.

For approximately the next two months the stock stayed relatively stable, actually gaining a few points and reaching a high of over $18 per share. However, on May 10 and 11, 1983, the stock's price again began to fall, dropping nearly two points in as many days. On May 12, Fortune made a public announcement of "reduced order rates for its products." Statement of Material Facts not in Dispute in Support of Defendants' Motion for Partial Summary Judgment filed May 12, 1987, at 2, ¶ 2. The price of the stock fell quickly and dramatically, eventually stabilizing a few days later and again gaining a few points in recovery. The price of the stock then remained relatively stable until June 1, when Fortune sent a letter to its shareholders stating that it now expected a loss for the second quarter of 1983. This development was reported in the financial press the next day, June 2. *Id.* at 2, ¶¶ 3, 4. Once again, this set off a swift fall in the price of the stock, followed by stabilization and a slight recapture of the decline in price. The price then remained relatively steady at $13 per share for the next two weeks. Plaintiffs filed their first suit alleging securities violations in state court on June 15, 1983. When the public announcement was made of the lawsuit on June 20, the price of the stock swiftly declined, reaching a low of $11 per share. *See, e.g.,* Memorandum in Reply to Opposition to Defendants' Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Counter Motion for Partial Summary Judgment (hereinafter "Defendants' Reply Brief"), Exh. A (chart of stock's performance from March 4 through June 20, 1983), filed June 16, 1987. Plaintiffs thereafter filed a complaint in this Court on July 15, 1983, based on the same allegations as in the state action and charging violations of the Securities Act of 1933, 15 U.S.C. § 77a

*et seq.* (hereinafter "the 1933 Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (hereinafter "the 1934 Act"). The parties have since obtained a stay of the proceedings in the state court action pending the outcome of the present action.

In their complaint, plaintiff class alleges that the prospectus for the IPO contained numerous material omissions and misrepresentations, thus causing plaintiffs a significant loss of money due to the dramatic decline in the price of the shares from their opening offer of $22 to the low in late June of $11. The basic omissions and misrepresentations alleged by plaintiffs are that Fortune and the other defendants failed to disclose in the prospectus that: (1) Fortune was having problems with its new computer product; and (2) that Fortune was losing orders and customers based on those problems. Plaintiffs allege that these omissions were not revealed to them until the May 12 and June 1 disclosures, thus violating federal securities laws as well as California state law of fraud and negligent misrepresentation.

Defendants deny that there were any material omissions or misrepresentations in the IPO's prospectus. Defendants also argue that various plaintiffs did not actually rely on any alleged omissions or misstatements in their purchase of the Fortune shares, and further that the majority of plaintiffs' losses were not due to any alleged omissions or misstatements, but rather to market or "other" forces. It is this latter argument that any alleged omissions or misstatements did not "cause" plaintiffs' losses that the motions for partial summary judgment address. Defendant Fortune's motion for judgment on the pleadings concerns plaintiffs' reliance and its failure to plead actual or direct reliance, and argues that plaintiffs are not entitled to a presumption that they relied on the prospectus or any alleged omissions or misstatements.

Discovery in this action has been long and voluminous, proceeding at a varying rate for over two years. In that time, over fifty witnesses have been deposed, and the parties have exchanged over 500,000 documents; discovery is now closed. In addition to certifying a plaintiff class and a class of defendant underwriters, the Court has also dismissed a number of the causes of action in plaintiffs' complaint, including those based on §§ 12(2) and 17(a) of the 1933 Act, 15 U.S.C. §§ 77*l* (2), 77q(a). *See* Orders filed Mar. 29, 1984; R.T. Mar. 26, 1984; Opinion filed Sept. 17, 1984 (*In re Fortune Systems Securities Litigation*, 604 F.Supp. 150 (N.D.Cal.1984)). The only claims left in this action are those brought under § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder (hereinafter jointly referred to as "§ 10(b)"); § 11 of the 1933 Act; and claims charging common law fraud and deceit, and common law negligent misrepresentation.

## II

Defendants bring a motion for partial summary judgment solely on the issue of *"loss causation."* Defendants' motion, simply stated, is that the alleged omissions or misstatements could only have been the proximate cause of the decline in the price of the Fortune shares from May 12, the date of the public announcement of Fortune's reduced orders on its products, until June 15, the date of filing of the first suit by plaintiffs. Therefore, defendants seek partial summary judgment that plaintiffs may only recover damages for any loss occurring within that time frame, assuming the other elements of the causes of action are proven. Plaintiffs oppose defendants' motion, and move for partial summary judgment claiming that causation for the entire period is established as a matter of law because defendants have failed to present any evidence that the decline in the price of the stock during the relevant time period was due to forces other than the omissions and/or misstatements.

In their motion for partial summary judgment, defendants initially argue that the decline in the price of the shares *prior to* May 12, the date of the public announcement, was due to the disastrous management of the IPO and the undesirability of the shares, and was not caused by any alleged omissions or misrepresentations.

Therefore, defendants urge that because the alleged omissions were not the *"proximate cause"* of the pre-May 12 decline, plaintiffs cannot recover for that "loss" from defendants under § 10(b), the fraud, or the negligent misrepresentation claims. Further, defendants argue that because the pre-May 12 decline was due to forces "other than" the alleged omissions or misstatements, plaintiffs may also not recover for those losses under § 11. *See* 15 U.S.C. § 77k(e).

Defendants proceed to argue that alleged post-June 15 losses are also not recoverable because the filing of the suit on June 15 bars plaintiffs from recovering for any "loss" after that date. Defendants assert that, under § 11, the time of filing suit creates a deadline for the recovery of any loss, and thus bars plaintiffs' recovery for any alleged loss, after that date. Defendants also assert that under § 10(b), fraud, and negligent misrepresentation, plaintiffs had a duty to mitigate their damages by selling their shares once a reasonable person would have been aware of defendants' alleged wrongdoing. *According to* defendants, plaintiffs as a matter of law were "aware" of the nature of defendants' alleged wrongdoing by June 15 because a "reasonable" person would have been so aware and, thus, they had a duty to mitigate by that date.

Plaintiffs oppose defendants' motion in its entirety, and bring a counter motion for partial summary judgment on the grounds that defendants have failed to present evidence that anything "other than" the alleged omissions or misstatements were the cause of the stock's decline during the entire period at issue. Specifically, plaintiffs argue that under § 11, defendants have failed to meet their burden of showing that market forces *other* than the omissions caused the decline in the price of the shares prior to May 12. Plaintiffs assert that they are thus entitled to summary judgment on the § 11 claim because defendants have produced no evidence to show that market forces and not the omissions were the cause of the pre-May 12 decline. *Celotex v. Catrett Corp.,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiffs then ar-

gue that they are entitled to a rescissory measure of damages under the § 10(b), fraud, and negligent misrepresentation claims, thus requiring the submission and consideration of evidence on the pre-May 12 stock behavior. Finally, plaintiffs urge that evidence of the post-June 15 stock price decline should be allowed for two distinct reasons: (1) because they were not aware of the "full extent" of the defendants' wrongdoing on June 15 when they filed suit, and (2) because the "value" of the stock on June 15, as defined under § 11, was not the same as the price of the stock on that date.

The Court will discuss the application of §§ 11 and 10(b) as well as the law of fraud and negligent misrepresentation, first to the pre-May 12 period, and then to the post-June 15 period.

### A. *Pre–May 12 "Losses."*

#### 1. Section 11 Proof.

The parties agree that all four of the causes of action alleged in plaintiffs' complaint, including that under § 11, require "causation" as an element of recovery. *See Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 622 (9th Cir.1981); *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336 (2d Cir.1987); *Huddleston v. Herman & MacLean,* 640 F.2d 534 (5th Cir.1981); *Rosenbloom v. Adams, Scott & Conway, Inc.,* 521 F.Supp. 372 (S.D.N.Y.1981); *Gagne v. Bertran,* 43 Cal.2d 481, 275 P.2d 15 (1954). If a plaintiff establishes a *prima facie* case under § 11, causation is presumed and the burden is then on defendants to show that "factors other than" the omissions caused the decline in the value of the stock for which plaintiffs seek to recover. Under § 11(e), 15 U.S.C. § 77k(e), a defendant may "reduce his liability by proving that the depreciation in value resulted from factors other than the material misstatement [or omission] in the registration statement." *Akerman,* 810 F.2d at 340. Defendants' burden has been characterized as "the burden of 'negative causation'"; though it is a "heavy burden," it "is not insurmountable." *Id.* Defendants' motion in this ac-

tion as it concerns the § 11 claim, as well as the other claims, will center upon causation, specifically "loss causation."

■ There are *two* types of causation required in a securities fraud claim; a plaintiff "must prove both *transaction causation,* that the violations in question caused the plaintiff to engage in the transaction, and *loss causation,* that the misrepresentations or omissions caused the harm [i.e., the decline in the price of the stock]." *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir.1984) (emphasis added). Put simply, loss causation requires that the "damages [of the plaintiff] must be the direct result of the misrepresentations or omissions." *In re Washington Public Power Supply System,* 650 F.Supp. 1346, 1353 (W.D.Wash.1986). The loss causation element merely requires that the plaintiff show that his damage is a *result of* the defendant's wrongdoing before he may recover.

The loss causation requirement is satisfied "only if the misrepresentation [or omission] touches upon the reasons for the investment's decline.... If [the omissions] are not the proximate reason for [plaintiff's] pecuniary loss, recovery under the Rule is not permitted." *Huddleston,* 640 F.2d at 549. If this were not so, "Rule 10b–5 [and § 10(b)] would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission." *Id.; see also In re Catanella & E.F. Hutton & Co.,* 583 F.Supp. 1388, 1417 (E.D.Pa.1984). When a portion of the plaintiff's loss is due to "an independent intervening cause, such as a fluctuation in the stock market, ... the chain of causation" has been broken, and the defendant cannot be held liable for that portion of the plaintiff's "loss." *Id.* at 1416. *Accord Huddleston,* 640 F.2d at 549; *Fryling v. Merrill Lynch, Pierce, Fenner & Smith,* 593 F.2d 736 (6th Cir. 1979) (no causation where market conditions, rather than fraud, responsible for loss). As the cases make clear, "loss causation" is *separate* from "transaction causation," and demands separate proof of plaintiffs in this type of action.

■ The pre-May 12 Fortune stock performance can be broken down into three parts: (1) March 4 through March 22, when the stock was first offered and dropped dramatically due to the poor management of the IPO; (2) March 23 through May 9, when the stock "stabilized" and actually *outperformed* other similar stocks, *see* Defendants' Reply Brief at 14–16; and (3) May 10 through May 11, the two days prior to the May 12 announcement when the stock again fell. Defendants argue that the decline in the price of the Fortune shares from March 4, 1983, the first day of the IPO, through May 11, 1983, the close of business on the evening before the May 12 disclosure, is due to market factors having nothing to do with defendants' alleged omission in the prospectus.

Specifically, defendants assert that the poor management of the IPO, and the resulting cancellations of orders for the shares, led to the sharp two-week decline immediately after the offering. *See* Declarations of Jason Wacha and Jordan Eth in Support of Defendants' Motion for Partial Summary Judgment (hereinafter "Wacha Declaration" and "Eth Declaration") filed May 12, 1987; Cooney Declaration; Lebovitz Declaration. Defendants point to the fact that the stock stabilized and actually gained several points over the following two months, thus showing that the stock itself was viable and marketable, only falling dramatically again on May 12, when the disclosure occurred. Defendants also argue that there is no evidence whatsoever of insider trading with regard to the decline in the stock on May 10 and 11, as plaintiffs assert, and that, therefore, plaintiffs have failed to rebut defendants' evidence under § 11. *See Akerman,* 810 F.2d at 342. According to defendants, the stock's performance "proves" that the overall decline of the stock's price prior to May 12 was unrelated to the alleged omissions. Because the market *could not* react to the omissions until they were actually learned of, *see Harris v. Union Electric Co.,* 787 F.2d 355, 368 (8th Cir.1986), and there is no evidence that the market learned of the omissions prior to May 12,

defendants argue that the stock's decline prior to the disclosure on May 12 must have been for "other reasons" as contemplated under § 11.

Plaintiffs do in fact *admit* that the IPO was a "serious mistake," resulting in a disastrous opening for the shares' offering. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Counter Motion for Partial Summary Judgment Against Defendants (hereinafter "Plaintiffs' Memorandum"), filed June 5, 1987, at 4. The evidence is undisputed that the stock fell quickly and dramatically from the moment it was put up for sale, throughout the first two weeks it was offered. It is also undisputed that the stock performed remarkably better after this initial two-week "settling period." Plaintiffs argue, however, that even this initial dramatic decline in the stock's price immediately after the offering was due to the omissions in the prospectus, as well as to the fact that the market at that time was "flooded" with adverse information concerning the products of Fortune and their performance in the marketplace. In support of this, plaintiffs present documents "showing" that "others" were well aware of the Fortune product's problems, specifically the dealers and customers. Declaration of George Donaldson in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Counter Motion for Partial Summary Judgment (hereinafter "Donaldson Declaration"), Exhs. E, G, H, filed June 5, 1987.

Initially, the Court notes that plaintiffs' documents "showing" that others were aware that Fortune was having problems with its product, the information allegedly omitted from the prospectus, are supported solely by the declaration of plaintiffs' attorney based on his "information and belief." *See* Donaldson Declaration at 2–3 (declar-

ant is "informed and believes" that the attached exhibits were "produced in this litigation by defendant Thomson Communications, Inc.").[3] This declaration and the above-mentioned documents clearly do not meet the requirements of Rule 56 of the Federal Rules of Civil Procedure, *see United States v. Dibble*, 429 F.2d 598, 602 (9th Cir.1970), *Hudson v. Moore Business Forms, Inc.*, 609 F.Supp. 467, 477 (N.D.Cal. 1985). Declarations may only be based on matters that are within the *personal* knowledge of the declarant, and upon which the declarant is capable of testifying. Furthermore, the documents are unauthenticated, unidentified, and appear to consist almost entirely of hearsay. As presented, the Court has difficulty even determining what the documents are intended to illustrate.

Strictly applying the language and intent of Rule 56, and the Federal Rules of Evidence, these "documents" are inadmissible for purposes of this motion, and should be disregarded. Assuming, *arguendo*, that the documents are admissible for this motion, the Court nevertheless finds them of little probative value and insufficient to rebut the evidence presented by defendants. Apparently, the documents "show" that others knew that Fortune was having problems, that it was common knowledge that the orders of Fortune were falling off, and that this was "known" to the market. However, the documents, consisting of presentations to the Fortune Board of Directors "illustrating" the erosion of the dealers' confidence in the Fortune product, fail to show *how* the market got this information, whether in fact anyone in the market *ever* had access to this information, or whether this information had any effect on the decline in Fortune's stock from March 4 through May 12. The documents as they stand show no more than that various dealers, in response to their experience with the Fortune product, were dissatisfied with

---

**3.** Plaintiffs' counsel filed responsive papers addressing the inadequacy of the declaration and the accompanying exhibits on June 18, 1987, the day of the hearing. A copy of these papers, several inches thick, was delivered to chambers at approximately 1:15 p.m., forty-five minutes before the hearing was scheduled to begin. As plaintiffs' counsel was informed at the hearing on June 18, these papers violated the Local Rules for the filing of papers, *see* Local Rule 220–3, 220–4, and, thus, will not be considered in this motion.

the product. The documents fail absolutely to show that the market was "flooded" with adverse information, or that the market was aware of information that was not already contained in the Fortune prospectus. This evidence is at best "merely colorable [and] not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citation omitted).

Defendants next present evidence that the Fortune stock actually *outperformed* both the market in general, and the stocks of similar computer manufacturers, during the period from March 22 through May 9. Defendants' Reply Brief at 14–15; Wacha Declaration and accompanying exhibits. The evidence submitted by plaintiffs to rebut defendants' evidence for the period from March 22 through May 9, as well as plaintiffs' evidence for the decline on May 10 and 11, consists primarily of the opinions and speculations of an expert, and the consideration of certain general performance indexes for the market during roughly the same period.

Plaintiffs' expert examined the performance of the Fortune stock as compared to the performance of other stocks on the exchange, examined the May 10 and 11 decline, and "investigated" whether other factors could have existed that would account for either decline. Based on the performance of the other stocks and his investigation (discovering "no such factors"), the expert concluded that the overall decline in the stock price was due to "adverse information that was either leaked to or otherwise learned by the investment community concerning" the problems of Fortune's product. The expert also concluded that the decline on May 10 and 11 was due to "early disclosure" of the contents of the May 12 disclosure, and presumably insider trading on that "early disclosure." Declaration of John B. Torkelson in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Counter Motion for Partial Summary Judgment (hereinafter "Torkelson Declaration"), filed June 5, 1987, at 4, 5. The heart of the expert's conclusions on the May 10 and 11 decline were based on the fact that

the "only logical explanation" for the decline is the "early disclosure of the contents of the May 12 announcement before formal announcement." *Id.* at 5.

As defendants point out in their reply papers, plaintiffs' expert is *not* an expert in causation, only in damages. Furthermore, the expert *assumed* defendants' liability for purposes of his deposition testimony, "accepted ... as truth [plaintiffs' attorney's statement that the insiders had not traded during the relevant period] ..., [and did] *not* pursue [the insider trading inquiry] any further." Supplemental Declaration of Jordan Eth in Support of Defendants' Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Counter Motion for Partial Summary Judgment (hereinafter "Eth Supplemental Declaration"), Exh. A at 114, filed June 16, 1987 (emphasis added).

Initially, the Court notes that the expert's comparison of the performance of Fortune's stock as to that of other "relevant" stocks is considerably undercut by the fact that the expert included in his analysis of the Fortune stock's performance the initial two-week decline, and the decline of May 12. Based upon the evidence submitted, the Court finds that the initial two-week decline is clearly a result of market and "other forces" unrelated to the alleged omissions. Further, the decline on May 12 is not an issue in this motion and, when included in any analysis, deceptively "skews" the performance of the Fortune stock. As defendants point out, once these two sources of misleading data are excluded, a comparison reveals that the Fortune stock actually *outperformed* the stock market in general, as well as the stocks of similar "high Technology" companies.

The expert's conclusions are also subject to attack by his own statements made at his deposition that the market was "surprised" by the announcements on May 12 and June 1, and that the news was "unexpected." Eth Supplemental Declaration, Exh. A at 212–13. This weakens the expert's statements on both the "conclusions" of insider trading, as well as on the state-

ment that "adverse information ... was either leaked to or otherwise learned by the investment community" prior to the public announcement of May 12, thus causing the earlier decline. *See* Torkelson Declaration at 4, 5. In sum, plaintiffs' expert admitted that he did not "pursue" the insider trading inquiry "any further" after assurances by plaintiffs' counsel that insiders had not traded, included in his analysis of the Fortune stock performance the unrelated initial two-week decline and irrelevant and misleading decline of May 12, and stated at his own deposition that he believed the market was "surprised" by the adverse information announced on May 12. These factors together considerably undermine the expert's conclusions, and renders inconclusive at best and not significantly probative his opinions on the decline from March 4 through May 9, 1983.

In addition, plaintiff has presented no specific facts whatsoever of any insider trading that could account for the May 10 and 11 decline. The only evidence presented by plaintiffs is the expert's "conclusion" that "the only logical explanation for [the two-day decline on May 10 and 11] was the early disclosure of the ... May 12 announcement," and presumably the "trading" on that information. Torkelson Declaration at 5. This "conclusion" is based on the evidence, already discredited, of the general performance of the stock market and of the stocks of other "high technology" firms from March 4 through May 12, and the expert's evidently brief investigation. As the court found in *Akerman*, "[t]he price decline before disclosure may not be charged to defendants," *unless* the plaintiffs can *prove* that insider trading "deflated [the stock's] price before public disclosure." *Ackerman*, 810 F.2d at 342. *See Beecher v. Able*, 435 F.Supp. 397 (S.D. N.Y.1975); *Fox v. Glickman Corp.*, 253 F.Supp. 1005 (S.D.N.Y.1966). There, the court noted that "after extensive discovery, however, the plaintiffs produced absolutely no evidence of insider trading." *Ackerman*, 810 F.2d at 342. The situation is identical here. Despite two years of voluminous discovery, plaintiffs have failed to produce a single specific fact that could be considered evidence of alleged insider trading on May 10 and 12.

The Court refuses to allow speculation, unfounded opinions, and misleading comparisons to create a genuine issue of material fact for trial on the issue of loss causation. Plaintiffs have failed to rebut defendants' evidence concerning the decline from March 4 through May 11. Thus, defendants have met their heavy burden under § 11, and have shown that "other forces" caused the decline in the Fortune stock from March 4 through the close of the stock exchange on May 11. The Court cannot draw the "inferences from the [plaintiffs'] 'specific facts'" that plaintiffs urge in their papers because the inferences are not reasonable "in view of other undisputed background [and] contextual facts...." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). Plaintiffs have failed to rebut defendants' evidence showing that their claims are "implausible" in light of the "factual context," *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986). Plaintiffs have failed to come forward with "specific facts showing that there is a genuine issue for trial," *Anderson*, 106 S.Ct. at 2514, and the Court must, therefore, grant defendants' motion for partial summary judgment on this issue for the § 11 claim of plaintiffs.

2. Section 10(b)—Fraud and Negligent Misrepresentation.

It is clear that under § 10(b), and the common law claims, the burden is on plaintiffs to prove causation in order to recover. *See Arrington*, 651 F.2d 615; *Feldman v. Simkins Industries, Inc.*, 492 F.Supp. 839, 847 (N.D.Cal.1980). *Gagne*, 43 Cal.2d 481, 275 P.2d 15. Plaintiffs have asserted in their opposition papers that defendants' summary judgment motion on the § 10(b) and common law claims must be denied because the evidence creates a genuine issue of material fact for trial, and because the proper choice of remedies requires the consideration of the pre-May 12 decline.

The Court initially notes that these claims involve precisely the same factual

considerations as the § 11 claim, and arise out of precisely the same factual allegations. Therefore, for the reasons discussed in the preceding section, the Court similarly finds that plaintiffs have failed to show that a genuine issue of material fact exists on the causation element of the § 10(b) or common law claims for the pre-May 12 decline in the price of the Fortune stock.

■ Under the "remedy" argument, plaintiffs assert that they are entitled to a remedy of rescission, regardless of whether the causation element as discussed in this motion. is satisfied. Plaintiffs ignore the fact that "loss causation" is an element that must be proven *before* plaintiffs are entitled to recover anything in this action, regardless of the remedy. Even if rescission were chosen as the appropriate remedy in this action, plaintiffs would *still* have to prove that their damages were a direct result of the alleged omissions. Indeed, in determining whether rescission would be the proper remedy, the Court must consider just how much of plaintiffs' alleged "losses" were a result of defendants' wrongdoing, and the actual change in plaintiffs' financial position. *Arrington,* 651 F.2d at 621; *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir.1976) (Sneed, J. concurring).

■ In addition, plaintiffs at this point have not shown that they would be entitled to a remedy of rescission. The *general rule* is that a plaintiff is entitled to "out-of-pocket" damages that he can prove *resulted* from the defendant's wrongful acts. Rescission is only properly awarded (a) where there is privity between defendant and plaintiff, or (b) where defendant sold shares of its own to take advantage of the omission. *Arrington,* 651 F.2d at 621; *Green,* 541 F.2d at 1343. The choice is within the discretion of the trial judge. *Id.* In this case, defendants are *not* in privity with plaintiffs because they did not sell plaintiffs their shares, *see* Opinion filed September 17, 1984 (*In re Fortune Systems,* 604 F.Supp. at 159–60), and defendants did not sell their own Fortune shares to benefit from the omissions. In the factual situation presented in this action, re-

scission does not appear to be the proper remedy in any event.

Plaintiffs have argued that two footnotes in Judge Sneed's concurrence in *Green,* 541 F.2d at 1341 nn. 1–2, support a choice of rescission as a remedy where the defendant has "benefited" from the omission. Plaintiffs argue that here defendants benefited because they received money from the IPO, and they should "disgorge" that money to plaintiffs under a remedy of rescission. However, plaintiffs fail to note that Judge Sneed found that rescission may *not* be justified in the case of an IPO where there are no "direct dealings" between the defendant corporation and the plaintiffs because it would unfairly allocate market losses to the defendant. Plaintiffs also fail to note that the majority of court decisions on the issue counsel *against* rescission because it would overcompensate plaintiffs by awarding them *market* losses, not just *direct* losses. *See In re Washington,* 650 F.Supp. at 1355. Judge Sneed's opinion did not directly consider the special situation of an IPO like Fortune's and, thus, did not indicate any justification for an exception to the general rule of out-of-pocket losses that would pertain to this situation. In accordance with the general rule, rescission is, thus, not appropriate in this action. Defendants' motion for summary judgment must be granted as to these claims as well.

### B. *Post–June 15 Decline.*

The cross-motions for partial summary judgment next address the issue of whether plaintiffs can prove that the alleged omissions or misstatements were the "proximate cause" of plaintiffs' alleged losses *after* June 15, the date on which plaintiffs filed their first suit charging defendants with wrongdoing.

#### 1. Section 11 Claim.

■ Both parties agree that under § 11(e)(1), plaintiffs' damages "shall represent the difference between the amount paid for the security ... and ... the value thereof as of the time such suit was brought...." 15 U.S.C. § 77k(e). Plaintiffs argue that the price of the Fortune stock on June 15, the date when the first suit was filed, was not the "value" of the

stock on June 15. Although there is one case in which a court determined this to be true, plaintiffs have presented absolutely no evidence in this action to support such a claim, and the Court, accordingly, rejects this argument.

The "value" of a security may be found to be different from the actual price of the security, but this is an unusual and rare situation. In general, price and value are used interchangeably, and the courts have not often found the "true value" of a stock to differ from its market value. *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239 (7th Cir.1977). The risks and uncertainty involved are self-evident. The only case cited by the parties, or found by the Court, is the case of *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 415 (N.D.Ill. 1984). In that case, the court relied on the fact that the plaintiff represented that she could show "fraud on the market" through the holding of two press conferences by the defendant company, allegedly spreading false statements that artificially inflated the price of the stock. The court in *Grossman* was hesitant to grant summary judgment before discovery was completed.

Such is not the case here. Plaintiffs have had full and fair discovery, and have not presented any evidence of special circumstances showing "fraud on the market," or false statements to the public with the intent or effect of inflating the price. Further, plaintiffs have failed to present any evidence indicating that the price of Fortune stock on June 15 differed at all from its "value." Plaintiffs have thus failed to raise any genuine issue of material fact that would defeat defendants' motion for partial summary judgment on this issue and, accordingly, the Court finds that plaintiffs may not recover for any alleged losses suffered after June 15 under their § 11 claim, and grants defendants' motion as to this claim.

### 2. Section 10(b), Fraud, and Negligent Misrepresentation.

▪ In the Ninth Circuit, a plaintiff's damages under § 10(b) are "limited by what they would have realized had they acted to preserve their assets or rights when they *first* learned of the fraud or had reason to know of it." *Arrington*, 651 F.2d at 620 (emphasis added); *Foster v. Financial Technology, Inc.*, 517 F.2d 1068, 1072 (9th Cir.1975). In addition, the Ninth Circuit "applies ordinary ... mitigation principle ... in [§ 10(b) and] 10b–5 cases." *Arrington*, 651 F.2d at 620. A plaintiff is thus obligated to mitigate his damages as soon as "the nature of the danger of holding [the] securities ... [becomes] apparent," and may not recover "that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm." *Id.*

Plaintiffs here seek to avoid the clear rule set out above by arguing that "full disclosure of *all* of defendants' alleged misconduct had [not] occurred by" June 15. Plaintiffs' Memorandum at 20. Plaintiffs do not dispute that they had full and fair notice of the alleged omissions and misstatements by the very fact of the public announcements of defendants on May 12 and June 1. Plaintiffs also do not dispute that they had full notice of the specific and daily changes in the price of the stock over the entire period from March 4 through June 15. Furthermore, plaintiffs admit that they waited for over two weeks after the second public announcement to file suit in state court, and still many of them did not sell their stock. Now plaintiffs seek to recover for the decline in the stock that occurred after June 15, as a result of the announcement of the filing of their *own* lawsuit.

The evidence is absolutely clear that by June 15 plaintiffs had, if not actual notice of the nature of defendants' alleged wrongdoing and the accompanying danger to their shares, then at the very least reasonable notice of the type of danger presented to their holdings by defendants' alleged past actions and the nature of those actions. To allow plaintiffs to recover damages after the June 15 date is to award plaintiffs the opportunity to recover for being unreasonable and for failing to mitigate their damages. The Court, therefore, must grant defendants' motion for partial

summary judgment on plaintiffs' § 10(b), fraud, and negligent misrepresentation claims holding that as a matter of law plaintiffs may not recover for any alleged losses suffered after June 15, 1983.

### III

■ Defendant Fortune in its motion for judgment on the pleadings attacks plaintiffs' failure to affirmatively plead "actual reliance" on the alleged omissions or misstatements in the Fortune prospectus, and moves for dismissal of the § 10(b), fraud, and negligent misrepresentation claims.[4] Neither party disputes that reliance is an essential element of proof in any action under § 10(b), as well as under fraud and negligent misrepresentation. *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975). Similarly, both parties agree that reliance need not be proved with particularity by plaintiffs in the context of an "open market" sale. *Id.* However, defendants argue that in the context of this action, a sale of a new issue not on the "open market," plaintiffs are required to prove *actual* reliance and may not stand on the "presumption of reliance" that attaches with an omission that leads to "fraud on the market." *But see Arthur Young & Co. v. United States,* 549 F.2d 686 (9th Cir.1977). Plaintiffs counter that *Arthur Young* specifically requires that plaintiffs be afforded a "presumption" or inference of reliance in the present situation.

Defendants agree that *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), altered the prior requirement that plaintiffs prove actual subjective reliance, and instead established that in circumstances "involving primarily a failure to disclose, positive proof of reliance is not

a prerequisite to recovery. All that is necessary is that ... a reasonable investor might have considered [the omissions] important in the making of this decision." The Ninth Circuit expanded upon this holding, and held that in cases of *either* misrepresentation or omission, reliance can be *"inferred* from the materiality of the misrepresentation." *Blackie,* 524 F.2d at 906 (emphasis added). In such instances, the burden *"shift[s] to defendant ...* [to disprove] a prima facie case of [reliance]." *Id.* (emphasis added). Defendants may try to disprove reliance, and thereby defeat the presumption of reliance, by either disproving materiality, or by proving that the individual plaintiff did purchase or would have purchased "despite knowledge of the falsity." *Id.*

Defendants' present motion for judgment on the pleadings centers on whether the *Affiliated Ute* and *Blackie* "presumptions" of reliance should apply in the situation where the security is not a stock sold in the "open market," existing in an established and "efficient" market, but rather is a *new* issue or an issue not yet "established" on the open market—the situation present in this action with the IPO of the Fortune stock. Defendants admit that there are a number of cases that hold that the presumption *does* apply to new issues, and plaintiffs need not prove *actual* reliance. Defendants also recognize that the only Ninth Circuit case directly on point, *Arthur Young,* 549 F.2d 686, also holds that in the situation presented in this action, plaintiffs are entitled to an inference of reliance. Defendants argue, however, these cases have generally been decided in a different procedural posture, and have erroneously applied the *Affiliated Ute* and *Blackie* rea-

---

4. In their complaint, plaintiffs do not allege that they actually or directly relied on the Fortune prospectus in purchasing Fortune stock. Instead, plaintiffs rely on the "fraud on the market" theory, which gives rise to a presumption of reliance in certain circumstances and obviates the requirement of pleading actual or direct reliance. Plaintiffs' Third Amended Complaint, filed July 31, 1984, at ¶¶ 41, 54, 60, 65. *See Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975). Defendants argue that plaintiffs are not entitled

to the presumption of reliance in the circumstances of this action and, therefore, plaintiffs have failed to state a claim by not pleading actual or direct reliance as required of actions pursuant to 10(b), fraud, and negligent misrepresentation. Defendants' Memorandum of Points and Authorities in Support of Motion of Defendant Fortune Systems Corporation, et al., for Judgment on the Pleadings, filed May 19, 1987, at 2–3.

soning to situations where the analysis is unwarranted.

The *Blackie* case set out the law in this Circuit that for stocks traded on the *open market,* omissions and/or misrepresentations will give rise to an "equation of materiality with causation," thereby relieving plaintiff of the burden of proving actual reliance on the omission or misrepresentation in § 10(b) cases. The theory underpinning this holding was the understanding that even if the investor did not actually rely on the misrepresentation or omission, the investor reasonably relied on the *market* to set the accurate price for the stock and to be aware of all relevant information. When an omission occurs, "fraud on the market" occurs, and the price set by the market is false and thereby injurious to anyone who purchases the stock at the false price.

The court in *Arthur Young* took the *Blackie* rule even further, and held that the same rule would apply even for those securities *not* traded on the *open* market, but rather traded as new issues under an IPO or interests in limited partnerships. Then judge, now Chief Justice (of California) Lucas wrote that "[j]ust as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market ..., so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors...." *Arthur Young,* 549 F.2d at 695. Another decision of the Ninth Circuit a short time earlier addressing a similar factual situation had similarly expanded the *Blackie* reasoning, finding that "causation will be established for class certification purposes ... for all members of the classes if the omissions are shown to be material.... [T]he actionability of defendants' conduct is based on the materiality of their omissions and *not* on the individual reliance of the [class] members...." *Cameron v. E.M. Adams & Co.,* 547 F.2d 473, 477 (9th Cir.1976) (emphasis added).

Defendants, with admirable candor, acknowledge the *Arthur Young* rule, but argue that its holding was unwarranted and ill-advised, and is not binding on this Court. Although *Arthur Young* has been criticized, and is perhaps based upon an unnecessary expansion of the *Blackie* doctrine, it is still binding law upon this Court until expressly vacated or reversed. Furthermore, this Court has already recognized the validity and force of the *Blackie* and *Arthur Young* decisions in its earlier decision to certify the plaintiff class, *see* R.T. Mar. 26, 1984, at 35–37, and the consistency of that ruling will be maintained for the entirety of this action.

Defendants will not be unduly hampered by the presumption of reliance in the circumstances of this case. Defendants may still come to trial and attack each plaintiff's *actual* reliance, or the actual reliance of similar groups of plaintiffs. Defendants may do this in at least two ways: (1) by disproving the materiality of the alleged omissions or misstatements; or (2) by proving that an individual plaintiff purchased *despite* knowledge of the falsity or omission, or that he would have purchased even if he had known of the falsity or omission. *See Blackie,* 524 F.2d at 906–07; *Arthur Young,* 549 F.2d at 695. For the reasons discussed above, defendants' motion for judgment on the pleadings is denied.

## IV

For the reasons discussed above, and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1. Defendants' motion for partial summary judgment is GRANTED in its entirety. Plaintiffs recovery on all causes of action will be limited to losses suffered on or after May 12, 1983, and on or before June 15, 1983.

2. Plaintiffs' motion for partial summary judgment is DENIED.

3. Defendants' motion for judgment on the pleadings is DENIED.