**In re WORLDS OF WONDER
SECURITIES LITIGATION.**

**This Document Relates to: All Actions.**

**No. C 87–5491 SC.**

United States District Court,
N.D. California.

Jan. 20, 1993.

Order Denying Plaintiffs Motion
to Reconsider March 8, 1993.

See also 147 F.R.D. 208, 147 F.R.D. 214.

Glenn Goffin, San Francisco, CA, for plaintiffs.

Kristin Cappel, San Francisco, CA, for Deloitte and Touche.

## ORDER RE SUMMARY JUDGMENT

CONTI, District Judge.

## I. INTRODUCTION

Plaintiffs are a class of purchasers of stock and debentures issued by Worlds of Wonder, Inc. ("WOW"). Plaintiffs have sued several officers of WOW, two members of WOW's board of directors, WOW's independent auditor, the underwriters of WOW's securities offerings, and several major shareholders of WOW stock. Plaintiffs allege federal claims under Section 11 and Section 12(2) of the Securities Act of 1933, and also Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder. In addition, Plaintiffs allege state law claims of fraud and negligent misrepresentation.

Each defendant now moves for summary judgment. The court addresses these motions together in this Order.

## II. BACKGROUND

This case arises out of the demise of Worlds of Wonder, Inc. ("WOW"), a high-technology toy company which sold its products to major toy retailers, mass merchants, and department stores. Within a year of its incorporation, WOW reached the peak of success for the toy industry when its first product, a talking teddy bear, became the nation's best selling toy. Two years later, however, WOW's sales had declined dramatically, and WOW was faced with a serious liquidity crisis. WOW filed for bankruptcy protection within three years of its founding.

WOW was formed in 1985 around a single line of toy products, the World of Teddy Ruxpin, which featured an animated talking teddy bear. Teddy Ruxpin was among the best selling toys in the nation for the Christmas season of 1985. WOW ended its first fiscal year on March 31, 1986 with more than $93 million in net sales.

On June 20, 1986, WOW conducted an initial public offering of common stock (the "IPO"). The IPO was underwritten by a syndicate of investment banks and co-managed by Smith Barney, Harris Upham & Co. ("Smith Barney") and Dean Witter Reynolds, Inc. ("Dean Witter").

The offering materials for the IPO included a prospectus dated June 20, 1986 (the "IPO Prospectus"). The IPO Prospectus contained an extensive discussion of the risks WOW posed to investors,[1] including the fact that WOW's success was entirely based on a single product. The IPO Prospectus further cautioned investors that, given the competitive nature of the toy industry, WOW could not ensure that it could repeat its initial success. Also, the IPO Prospectus revealed that WOW's working capital, even considering the proceeds from the IPO, was not necessarily sufficient to last through the end of fiscal 1987 (March, 1987). Nevertheless, the investment community was enthusiastic about WOW. On the day of the IPO, the offering price of $18 per share was driven up to $29 by the close of the day.

Following the IPO, WOW continued to grow rapidly. WOW's second major toy was Lazer Tag, a game involving toy weapons that used infrared technology. Lazer Tag, like Teddy Ruxpin, was wildly successful when it first hit the market. It was the best selling toy for the 1986 Christmas season. Also, Teddy Ruxpin maintained its popularity for the most part during 1986. In Lazer Tag and Teddy Ruxpin, WOW had two of the ten best selling toys for the 1986 Christmas season. At the beginning of 1987, WOW was the toast of the toy industry, having recorded net sales of over $327 million for the previous fiscal year.

WOW's officers hoped to continue WOW's tremendous growth by introducing new lines of animated toys based on the Muppets characters, and by introducing lines of accessories intended to extend the life span of the demand for Teddy Ruxpin and Lazer Tag. To raise the necessary capital, on June 4, 1987 WOW conducted an offering of $92 million worth of convertible debentures (the "Debentures").[2] The Debenture offering was underwritten solely by Smith Barney.

The offering materials included a prospectus dated June 4, 1987 (the "Debenture Prospectus"). The Debenture Prospectus, much as the IPO Prospectus, contained an extensive discussion of the specific risks inherent in investing in WOW.[3] The Debenture Prospectus revealed facts showing that WOW's cash position was precarious at best. It was obvious to any reasonable investor that WOW would be unable to survive any unanticipated shortfall in its revenues, and this risk was well known to the market. Indeed, the two major rating agencies for securities, Moody's and Standard & Poors, rated the Debentures as below investment grade—that is, junk bonds. Although Smith Barney had initially indicated that it expected the interest rate WOW would bear on the Debentures

---

1. These risk disclosures are set forth in greater detail at *infra* part IV.B.1.

2. Debentures are unsecured debt, as opposed to bonds, which are secured by the assets of the issuing company.

3. These risk disclosures are set forth in greater detail at *infra* part IV.C.1.

to be 5.5–6%, the market ultimately demanded a 9% rate.

WOW's fortunes took a drastic turn for the worst shortly after the Debenture Offering. Financial results for the quarter ended June 30, 1987 were below the company's internal projections, even though the company had already predicted a substantial loss for the quarter. WOW's management hoped that the decline in sales was due to the normal seasonality of the toy business, where most sales occur during the Christmas season.

The big 1987 Christmas season that WOW had wished for, though, never occurred. WOW's officers blame the stock market crash on October 19, 1987. According to WOW's management, this made retailers cautious about ordering additional products. For whatever reasons, the entire toy industry experienced a severe downturn in late 1987. WOW was especially hurt because its only major products, Lazer Tag and Teddy Ruxpin, were high priced items that were particularly dependent on the Christmas season for sales. A substantial price reduction in WOW's major products in late October 1987, combined with a stepped-up advertising campaign, failed to spur sales to expected levels.

In December, 1987, WOW defaulted on the first interest payment on the Debentures. Faced with a severe liquidity crisis, WOW was unable to make it through the Christmas season as a going concern. WOW filed for bankruptcy on December 21, 1987.

The plaintiffs in this action are a class of purchasers of WOW common stock and Debentures ("Plaintiffs").[4] Plaintiffs assert that they were defrauded, or at least misled, regarding the risky nature of their investment. Plaintiffs allege that several of the various defendants' actions in connection with WOW's securities offerings misled investors, and unduly inflated the market price of WOW's securities. Most notably, Plaintiffs claim that the IPO Prospectus and the Debenture Prospectus contained misleading statements and omitted material information. They also claim that several of the defen-

dants traded WOW stock based on inside information.

Plaintiffs' Third Amended Complaint (the "Complaint") names as defendants several officers of WOW: Angelo M. Pezzani, former President and Chief Operating Officer; Donald D. Kingsboro, WOW's former Chief Executive; and Richard B. Stein, former Executive Vice President and Chief Financial Officer (collectively the "Officer Defendants"). The Complaint also names two directors of WOW as defendants: John B. Howenstein and Barry H. Margolis. Plaintiffs also allege claims against WOW's independent auditor, the public accounting firm of Deloitte Haskins & Sells, now known as Deloitte & Touche ("Deloitte"), and the underwriters of WOW's securities offerings, Smith Barney and Dean Witter (the "Underwriter Defendants"). The Complaint also alleges claims against certain large shareholders of WOW: Josephine E. Abercrombie, an individual; World of Wonder Shares Partnership ("WOW Shares Partnership"); and Robinson Interests, Inc. ("Robinson").

Plaintiffs' Complaint sets forth claims for relief alleging numerous violations of the federal securities laws. Plaintiffs' First Claim for Relief alleges violations of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder, 17 C.F.R. § 240.10(b)(5). Plaintiffs' Fifth and Sixth Claims for Relief, respectively, allege violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (a), in connection with the IPO Prospectus and the Debenture Prospectus. Plaintiffs' Seventh and Eighth Claims for Relief allege violations of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2), in connection with the IPO Prospectus and the Debenture Prospectus, respectively. Plaintiffs' Second and Ninth Claims for Relief state theories of joint and several liability for the alleged substantive violations of the securities laws.

In addition, Plaintiffs' Third and Fourth Claims for Relief allege state law claims of

4. This court certified the class pursuant to Federal Rule of Civil Procedure 23(b)(3) in an Order dated March 23, 1990. The class consists of individuals who purchased WOW common stock or Debentures during the period June 20, 1986 through November 9, 1987.

fraud and negligent misrepresentation, respectively.

The case is currently before the court on the various defendants' motions for summary judgment. The court addresses these motions together in this Order.

## III. SUMMARY JUDGMENT STANDARD

■ Summary judgment is proper if, after viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *Hutchinson v. United States,* 838 F.2d 390, 392 (9th Cir.1988). The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ If, however, the moving party demonstrates the absence of any genuine issue of material fact, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Id.* at 255, 106 S.Ct. at 2514. To meet this burden, the non-moving party must go beyond the pleadings and show "by her own affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## IV. PLAINTIFFS' SECTION 11 CLAIMS

Section 11 of the Securities Act of 1933 creates a private remedy for any purchaser of a security if any part of the prospectus "contained an untrue statement of a material fact or omitted to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k (a). A Section 11 claim can be asserted against every person who signed the prospectus, the issuer's officers and board of directors, the underwriters of the securities offering, and any expert whose profession gives authority to that part of the registration statement prepared by him. *Id.*

Plaintiffs' Fifth and Sixth Claims for Relief allege violations of Section 11 in connection with the IPO Prospectus and the Debenture Prospectus, respectively. Plaintiffs assert these claims against the Officer Defendants, the Underwriter Defendants, directors Howenstein and Margolis, and Deloitte.

### A. The Bespeaks Caution Doctrine and the Duty to Disclose Information in a Prospectus

#### 1. The "Bespeaks Caution" Doctrine

The Officer Defendants urge this court to adopt the "bespeaks caution" approach to securities fraud claims. The bespeaks caution doctrine holds that when a prospectus contains substantial disclosure of specific risks, statements that express management's optimism about future performance, despite those particular risks, are not misleading as a matter of law. Though this doctrine has not yet been adopted expressly by the Ninth Circuit, the trend in the recent cases heavily favors adopting this approach. In addition, the bespeaks caution doctrine would be dispositive not only of the claims against the Officer Defendants, but also of many of the claims against the other defendants. Thus, a discussion of the bespeaks caution doctrine and its application is necessary.

##### (a.) Origins of the Bespeaks Caution Doctrine

The bespeaks caution doctrine originated from language in *Polin v. Conductron Corp.,* 552 F.2d 797 (8th Cir.1977), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). In that case, the plaintiff, a shareholder in Conductron, alleged fraud by Conductron in its annual report. The report stated that Conductron's "results were 'expected' to show improvement, and the Company saw a 'possibility' of a break-even soon." *Id.* at 806 n. 28. The Eighth Circuit Court of Appeals held that "terms thus employed bespeak caution in outlook and fall far short of the assurances required for a finding of falsity and fraud." *Id.*

The Second Circuit established the bespeaks caution doctrine more firmly in *Luce v. Edelstein,* 802 F.2d 49 (2d Cir.1986). In that case, the plaintiffs, a class of purchasers

of shares in a limited partnership, claimed that the Offering Memorandum made certain false and misleading statements about the potential cash and tax benefits of the partnership. The court found that "the Offering Memorandum made it quite clear that its projections of potential cash and tax benefits were 'necessarily speculative in nature' and that 'no assurance [could] be given that these projections [would] be realized.'" *Id.* at 56. The Offering Memorandum further warned that "'[a]ctual results may vary from the predictions and these variations may be material.'" *Id.* The court held that the plaintiffs had failed to state a claim based on these statements, stating "[w]e are not inclined to impose liability on the basis of statements that 'bespeak caution.'" *Id.* The court relied on *Polin* for this proposition.

Since the *Luce* decision, the First, Sixth, and Eighth Circuit Courts of Appeals have adopted the bespeaks caution doctrine. In the First Circuit case of *Romani v. Shearson Lehman Hutton,* the plaintiffs claimed that the defendants fraudulently induced them to invest in a horse breeding farm. 929 F.2d 875 (1st Cir.1991). The plaintiffs, a class of similarly situated investors, alleged "misrepresentations and omissions in the offering materials that falsely inflated the partnership's financial potential." *Id.* at 876. The court found, however, that "the offering materials are replete with statements, some highlighted, emphasizing the high risks associated with [the partnership] and that '[t]here can be no assurance that the investment objectives of the Partnership will be obtained.'" *Id.* at 879. The court held that "[d]ocuments such as this, which 'clearly bespeak caution,' are not the stuff of which securities fraud claims are made." *Id.* (citing *Luce,* 802 F.2d at 56).

In *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037 (6th Cir.1991), the Sixth Circuit addressed a similar claim by a plaintiff class of shareholders. The plaintiffs alleged that certain projections of economic performance by the company's management artificially inflated the price of plaintiffs' shares. *Id.* at 1039. The court found, however, that these projections were "also accompanied by cau-

tionary language." *Id.* at 1040. The court affirmed the district court's dismissal of the case, holding that "economic projections are not actionable if they bespeak caution." *Id.*

The Eighth Circuit reinforced its position on the bespeaks caution doctrine in *Moorhead v. Merrill Lynch,* 949 F.2d 243 (8th Cir.1991). In *Moorhead,* the plaintiffs were purchasers of bonds used to finance a residential retirement center. The retirement center later filed for bankruptcy under Chapter 11, and under the reorganization plan the bondholders only received 60 cents per dollar owed. *Id.* at 244–45. The plaintiffs alleged a claim for securities fraud against Merrill Lynch based upon a feasibility study, prepared by Merrill Lynch and included with the offering memorandum, that was generally favorable on the future economic viability of the retirement center. *Id.* The district court had found that "the feasibility study contained a number of risk statements, detailed cautionary language and disclosures about the underlying economic assumptions, any of which could have affected the retirement center's ability to pay back the bonds." *Id.* at 245. The court of appeals affirmed the district court's entry of summary judgment for the defendants. *Id.* Though the court did not use the phrase "bespeaks caution," it held that "plaintiffs could not base a federal securities law claim on any misrepresentation or omission in the feasibility study which was addressed by the repeated, specific warnings of significant risk factors and the disclosure of underlying factual assumptions also contained therein." *Id.*

The Ninth Circuit has not yet explicitly adopted the bespeaks caution doctrine. However, the bespeaks caution doctrine is consistent with the Ninth Circuits' approach to securities fraud claims. In *In re Convergent Technologies Securities Litig.,* the plaintiffs, a class of purchasers of stock, alleged that defendants misled investors by concealing information on the company's cost and production problems with one of its product lines. 948 F.2d 507, 515 (9th Cir.1991). The court found, however, that the company's "[p]rospectus virtually overflows with Convergent's repeated emphasis of significant

risk factors." *Id.* The prospectus included the following disclosures:

> There can be no assurance that the company will successfully complete the development of its new products or that it will be successful in manufacturing ... or marketing the products in the face of intense competition;
>
> . . . .
>
> While the Company believes that the technical risks in the development of [the product line] are well controlled, the product cost objectives are very aggressive and there is no assurance they can be achieved.

*Id.* In affirming the district court's entry of summary judgment for the defendants, the court stated that "[n]o investor, in the face of these substantive disclosures, could reasonably conclude that Convergent had surmounted all obstacles in [the product's] path." *Id.* at 516. The court held that the prospectus was not misleading on these issues as a matter of law. *Id.* Thus, this case is consistent with the bespeaks caution approach.[5]

### (b.) Application of the Bespeaks Caution Doctrine

The parties disagree, predictably, on the application of the bespeaks caution doctrine to the facts of this case.

The Officer Defendants argue that if the court finds substantial risk disclosure in the IPO Prospectus and the Debenture Prospectus, then the defendants are completely immunized from liability under Section 11. This would be an overextension of the doctrine. Such an overbroad application of the doctrine would "encourage management to conceal deliberate misrepresentations · beneath the mantle of broad cautionary language." *Trump Casino,* 793 F.Supp. at 554. To prevent this from occurring, "the bespeaks caution doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates

or forecasts in a prospectus." *Id.* By contrast, blanket warnings that securities "involve a high degree of risk" have been held insufficient to ward against a federal securities fraud claim. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir.1981), *aff'd in relevant part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

In addition, the bespeaks caution doctrine does not apply to immunize false statements if the defendants knew the statements were false when made. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston,* 640 F.2d at 536.

Plaintiffs, for their part, argue that the bespeaks caution doctrine is no substitute for a fact-specific inquiry into each statement they allege to be misleading. Plaintiffs seem to be arguing that each statement they present to the court must be analyzed, with the benefit of hindsight, to determine whether it was misleading at the time it was made. According to Plaintiffs, the "bespeaks caution" cases discussed above do not obviate the need for this type of inquiry.

Plaintiffs' reading of these cases misses the whole point of the bespeaks caution doctrine. The doctrine holds that economic projections, estimates of future performance, and similar optimistic statements[6] in a prospectus are not actionable when precise cautionary language elsewhere in the document adequately discloses the risks involved. It does not matter if the optimistic statements are later found to have been inaccurate or based on erroneous assumptions when made, provided that the risk disclosure was conspicuous, specific, and adequately disclosed the assumptions upon which the optimistic language was based. *See Trump Casino,* 793 F.Supp. at 553–54. This aspect of the bespeaks caution doctrine represents an evolu-

---

5. One court even has read *Convergent Technologies* as adopting the bespeaks caution doctrine as the law in the Ninth Circuit. *See In re Donald Trump Casino Securities Litig.,* 793 F.Supp. 543, 551–52 (D.N.J.1992).

6. "Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company." *In re Verifone Securities Litig.,* 784 F.Supp. 1471, 1481 (N.D.Cal.1992) (citations omitted).

tion in the judicial analysis of whether a particular statement was misleading.

■ Accordingly, this court adopts the following formulation of the bespeaks caution doctrine. Estimates or forecasts of future performance in a prospectus are not actionable if the prospectus contains conspicuous language that bespeaks caution as to actual results. Furthermore, the cautionary language must specifically disclose the nature and extent of the risks involved.

In the context of a summary judgment motion, this approach answers in a dispositive way a claim that a particular statement is misleading. The doctrine holds that where a prospectus contains adequate cautionary language disclosing specific risks, no reasonable inference can be drawn that a statement regarding those risks was misleading. This is the analysis this court will apply to Plaintiffs' allegations that particular statements in the IPO Prospectus or the Debenture Prospectus were misleading.

### 2. The Duty to Disclose Information in a Prospectus

■ Plaintiffs also base their Section 11 claims on the defendants' alleged failure to disclose certain risks in the prospectuses. If the documents are completely silent on a matter, the "bespeaks caution" doctrine is inapplicable. One cannot simultaneously bespeak caution on a subject and not address it.

"The securities laws do not require an issuer of stock to disclose every bit of information that has some bearing on the issuer's future earnings." *In re Verifone Securities Litig.*, 784 F.Supp. 1471, 1480 (N.D.Cal.1992). In a fraud on the market case, "[s]ilence, absent a duty to disclose, is not misleading." *Basic, Inc. v. Levison*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). For Plaintiffs to prevail on a claim that the prospectuses omitted information necessary to prevent a fraud on the market, they must show, "as a threshold matter, that the information was of a kind which the defendants had a legally cognizable duty to disclose." *Id.*

The Supreme Court has set forth the standard for courts to apply in determining whether nondisclosure violates the securities laws. In *Basic, Inc. v. Levison*, the Court held that for nondisclosure to be actionable "there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." 485 U.S. at 231–32, 108 S.Ct. at 983 (emphasis added).[7] The Court "was careful not to set too low a standard" for disclosure. *Id.* at 231, 108 S.Ct. at 983. The Court expressed concern that too low a standard would "lead management 'simply to bury the shareholders in an avalanche of trivial information—a result hardly conducive to informed decisionmaking.'" *Id.* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

Thus, in evaluating Plaintiffs' allegations that the prospectuses were misleading for failing to disclose certain risks, the court will inquire whether a hypothetical reasonable investor would have felt the information necessary in deciding whether to invest in WOW.

Having set forth the analytical framework it will apply to this case, the court now turns to Plaintiffs' factual allegations based on the IPO Prospectus and the Debenture Prospectus. As noted above, the allegedly misleading statements or omissions offered by Plaintiffs cannot be judged standing alone. The statements that Plaintiffs claim are misleading must be evaluated in light of the risk factor disclosure set forth elsewhere in the document. Furthermore, the "bespeaks caution" doctrine precludes any inference that a statement which directly relates to any adequately disclosed risk factor is misleading. As to omissions alleged by Plaintiffs, the inquiry for this court is whether the particular omissions were of facts material to WOW's financial well-being at the time of the prospectus, so as to obligate WOW to disclose them in the prospectus.

---

7. The Court in *Basic, Inc.* was faced with only a Rule 10b–5 claim, but the lower courts have applied its standard for disclosure in Section 11 cases as well. *See, e.g., In re Verifone*, 784 F.Supp. at 1480.

B. *The IPO Prospectus*

1. *Risk Disclosure*

The IPO Prospectus contains a section titled "Risk Factors." This section consists of three single-spaced pages disclosing WOW's specific business risks, including the following cautionary language:

**Dependence on Single Product Line; New Product Introductions.** To date, the Company has marketed from a single product line, the World of Teddy Ruxpin. The product life cycle of a toy line is relatively short. Successful new products and new product lines may therefore be crucial to the success of the Company's business.... The Company has only limited experience in product introductions, and product line expansion will place great demands on management and other Company resources. If the Teddy Ruxpin product line loses market acceptance, or if new product introductions are unsuccessful, the Company's business would be affected adversely.

. . . .

**Competition.** The toy industry is highly competitive.... The relatively low barriers to entry into the toy industry also permit new competitors to easily enter the industry. The Company believes it has enjoyed limited competition to its Teddy Ruxpin product line. Due to the success of Teddy Ruxpin, however, the Company anticipates other companies will introduce talking toy products that will compete with Teddy Ruxpin and other new products announced by the Company. Such entrants might force price reductions or cause the Company to lose market share, which events may adversely affect the Company.

. . . .

**Seasonality of Quarterly Results; Loss for the First Quarter of Fiscal 1987.** Sales of toys are highly seasonal, with a majority of retail sales taking place during the Christmas season. Although indications of interest are provided by retailers early in the year, orders are generally cancellable without penalty. The seasonality of sales may cause operating results to vary significantly from quarter to quarter. The company anticipates that net sales for the quarter ending June 30, 1986 will be less than those for the prior quarter and, as a result, the Company expects to report a loss for the quarter.... There can be no assurance that the Company can maintain sufficient flexibility with respect to its working capital needs, manufacturing capacity and supplies of raw materials, tools and components to be able to minimize the adverse effects of an unanticipated shortfall in demand.

**Capital Requirements.** The Company's cash flow from operations, existing bank lines of credit and the proceeds of this offering may not be sufficient to provide the working capital required beyond the end of fiscal 1987. Thereafter, the Company may have to obtain additional working capital from expanded bank borrowings or through additional debt or equity financings. If the Company is unable to obtain adequate working capital from these sources on acceptable terms, its operations would be adversely affected. A significant portion of the Company's working capital is composed of accounts receivable. The Company believes the toy industry is characterized by accounts receivable on extended terms, especially in the summer months, and as a result a material portion of the Company's accounts receivable are aged longer than 90 days. The Company's liquidity may be adversely affected by excessive aging of its accounts receivable.

Significantly, the "Risk Factors" section of the IPO Prospectus is not buried beneath other, more optimistic language. On the contrary, it appears as the first major subsection of the document, directly after the Prospectus summary. Moreover, the front page of the IPO Prospectus contains the statement, in boldface type, that "Prospective investors should carefully consider the factors set forth under 'Risk Factors.'"

2. *Plaintiffs' Allegations and Evidence*

In their opposition to defendants' motions, Plaintiffs raise a number of arguments to support their claim that certain statements in, or omissions from, the IPO Prospectus

were misleading. The court addresses each of these arguments below.[8]

### (a.) Product Reliability and Defects

 The IPO Prospectus disclosed that initial versions of Teddy Ruxpin were being returned by the consumers at a level higher than 10%. According to the IPO Prospectus, 10% was the expected return rate for toys similar to Teddy Ruxpin. However, the IPO Prospectus predicts that "product returns for [this] existing product line will be favorably affected by recent product modifications." Plaintiffs argue that this latter statement is false or misleading because WOW allegedly was already experiencing a substantially higher return rate at the time of the IPO.

Plaintiffs evidence for this contention is flimsy at best. Plaintiffs present the testimony of some of WOW's customers that the return rate for Teddy Ruxpin at about the time of the IPO was over 20%. But this does not contradict the statement in the IPO Prospectus. The Prospectus predicts only that the return rate would decrease in the future as the modifications were implemented. Plaintiffs have no evidence that the return rate for Teddy Ruxpin *after* the modifications were made was higher than the rate before the modifications.

More importantly, WOW was not under any duty to disclose such information at all. There is no evidence that the return rate for Teddy Ruxpin had any effect upon WOW's sales of the product to retailers. Indeed, Teddy Ruxpin is still selling relatively well as of this date.[9] Disclosure of the actual return rate was not required to make the statement in the Prospectus not misleading, unless the return rate posed a material risk to investors at the time of the IPO. Plaintiffs have shown no evidence that this was the case.

### (b.) Poor Product Demand

 Plaintiffs claim that the IPO Prospectus falsely expressed optimism about the demand for the Teddy Ruxpin line of products. They base this allegation on the mere fact that WOW was introducing new accessory items intended to extend the life cycle of the Teddy Ruxpin line. The IPO Prospectus states that "[t]he Company believes that the marketing of these related items ... will help extend the life cycle of the product line."

This statement, however, does not constitute management's assurance that demand for the Teddy Ruxpin line would remain high. Even if it did, the IPO Prospectus adequately bespoke caution on the risks involved in investing in a company with only a single product line. Thus, any statement relating to the demand for Teddy Ruxpin is not misleading as a matter of law.

### (c.) Inadequate Internal Controls

 Plaintiffs contend that WOW's system of internal accounting controls was inadequate at the time of the IPO. They argue that the IPO Prospectus' silence on this matter was misleading. There is no evidence, however, that WOW's system of internal controls presented a substantial business risk to investors at the time of the IPO. On the contrary, WOW had retained Deloitte to install an entirely new system shortly before the IPO.

Plaintiffs point to several documents dated after the IPO, in which certain employees of WOW indicated that the company's rapid growth made necessary further improvement of the internal control systems. These documents, however, are not relevant to the issue of whether, at the time of the IPO, WOW had a duty to disclose any information about the alleged inadequacy of its internal controls. The company need only disclose those risks material to an investor's decision to purchase the securities. WOW did not have a duty to disclose every possible risk, no matter how slight, that may have arisen in the future.

---

8. The court addresses only those contentions raised by Plaintiffs in their opposition papers. Plaintiffs have made numerous other allegations of misleading statements or omissions in their Complaint; they have thrown in the proverbial kitchen sink. But because Plaintiffs do not offer any evidence to support these allegations, these allegations present no genuine issues of fact, and are not considered by the court in deciding these motions.

9. The Teddy Ruxpin line of products was sold to Hasbro.

### (d.) Extended Payment Sales

■ The IPO Prospectus states that "[t]he Company does not factor its accounts receivable and ships all of its products on terms requiring relatively prompt payment." Plaintiffs argue that this statement was false or misleading. They base this allegation solely upon the fact that in early 1986, WOW gave one customer extended payment terms on one order. Plaintiffs present evidence showing that in early 1986, defendant Kingsboro personally allowed Toys R Us to pay in 90 days or December 10, 1986, whichever was later, on an order of more than $3,700,000.

It is impossible for this court to hold that this one transaction makes the statement in the IPO Prospectus a violation of the securities laws. A few months may be considered "relatively prompt" among businesses when the amount to be paid is $3,700,000. Moreover, Toys R Us was the nation's largest toy retailer, as well as WOW's largest customer, so it is unlikely that WOW even could have bargained for better terms. Investors more likely would have felt misled by WOW's management if WOW had failed to enter this transaction.

In addition, Toys R Us paid in full in late 1986, and there is no evidence that this payment was ever in doubt. Thus, this transaction never posed a risk to WOW's investors, so WOW was not obligated to disclose its particulars.

### (e.) Guaranteed Sales

■ Plaintiffs contend that the IPO Prospectus failed to disclose that WOW engaged in "guaranteed sales," that is, allowing its customers to return goods for a full credit or refund. The testimony of WOW's officers shows that, from time to time, WOW attempted to reach mutually acceptable accommodations with customers who had problems with unsold inventory of WOW's products. WOW on occasion would allow the unsatisfied customer to return the product in exchange for another product on a dollar-for-dollar basis.

Just because some of WOW's customers were allowed a refund does not mean that, at the time of the IPO, WOW had a practice of offering guaranteed sales to all its customers. Giving an unsatisfied customer a refund is a normal business method of dealing with an unsatisfied customer. It is not a violation of the securities laws for WOW to fail to disclose such an obvious practice to potential investors.

Unless these alleged guaranteed sales were a substantial threat to WOW's revenues at the time of the IPO, WOW was under no duty to disclose them in the IPO Prospectus. Plaintiffs have no evidence that this was the case, so this omission cannot be said to have misled Plaintiffs.

### (f.) Accounts Receivable

■ Plaintiffs allege that the IPO Prospectus was false and misleading regarding WOW's accounts receivable. Plaintiffs claim that WOW's accounts receivable were severely inflated at the time of the IPO. Plaintiffs argue that the fact that WOW was forced to write-off $3,000,000 of these accounts shortly after the IPO is evidence that the IPO Prospectus was misleading on this issue.

The IPO Prospectus, however, specifically warned that "a material portion" of WOW's accounts were over 90 days old, and that "excessive aging" of these accounts would adversely affect WOW's liquidity. Any reasonable investor was able to interpret "excessive aging" as meaning inability to collect payment, forcing WOW to take a write-off. In short, the IPO Prospectus adequately bespoke caution on the risks concerning WOW's accounts receivable.

### (g.) WOW's Liquidity

■ Plaintiffs claim that the IPO Prospectus made statements about WOW's liquidity that were false and misleading. Specifically, they claim that WOW had less cash on hand than it anticipated. They also argue that WOW misled investors by projecting that its working capital "will be sufficient to meet the Company's short-term cash requirements through the end of fiscal 1987."

These are exactly the types of statements to which the bespeaks caution analysis applies. The "Risk Factors" section of the IPO Prospectus contained numerous statements

that very nearly begged investors to take notice of WOW's serious liquidity problems. Not only did the IPO Prospectus disclose that WOW was using bank credit lines for its working capital, it disclosed the fact that WOW possibly would soon have to seek additional lines of credit or sell additional equity to meet its future capital requirements. Any investor in WOW assumed these risks. In the face of this cautionary language, Plaintiffs cannot claim to be misled by the company's prediction that it would continue to be liquid.

### (h.) Summary

In sum, the court holds that the IPO Prospectus does not contain any false or misleading statements or omit any material risks that create liability under Section 11. Viewing the document as a whole, it clearly bespoke caution on the specific risk factors involved in investing in WOW. The alleged misrepresentations offered by Plaintiffs are trivial in nature compared to the extent of the disclosure of material risks found in the document. No reasonable jury could find that any material aspect of the IPO Prospectus was false or misleading. Each defendant is entitled to summary judgment on Plaintiffs' claims based on the IPO Prospectus.

### C. The Debenture Prospectus
#### 1. Risk Disclosure

The Debenture Prospectus, much as the IPO Prospectus, contained a section under the heading of "Risk Factors." This section contained detailed disclosures of the myriad risks involved in investing in WOW, that are substantially identical to the factors listed in the IPO Prospectus, supra IV.B.1. In addition, the Debenture Prospectus made the following disclosures:

**Competition.** Lazer Tag ... [has] faced more immediate and significant competition than that faced by the Teddy Ruxpin product line in fiscal 1986.

**Capital Requirements.** The Company's existing bank lines of credit and import financing line expire September 30, 1987 and December 31, 1987, respectively. To meet seasonal working capital requirements, the Company has borrowed, and

expects to continue to borrow, substantial amounts under these lines, both of which it expects to replace or extend prior to expiration. The Company anticipates that the proceeds of this offering, together with cash flow from operations, existing lines of credit and new bank credit facilities currently being negotiated, will provide sufficient funds to meet the Company's capital needs through March 31, 1988. However, if the Company is unable to obtain adequate capital from this offering and such new bank credit facilities on acceptable terms, its operations would be adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

This latter section to which the potential investor is referred makes the following further disclosure:

**Liquidity and Capital Resources**

Since its inception, the Company's internally generated cash flow has not been sufficient to finance accounts receivable, inventory and capital equipment needs, as well as support its growth. The Company has met its capital requirements to date primarily through borrowings under bank lines of credit, the private and public sale of equity securities and borrowings under subordinated notes payable to shareholders.

.... At June 3, 1987, the Company had outstanding borrowings of approximately $80 million, representing the maximum amounts available under the borrowing limits of its bank line of credit.

In addition to the bank line of credit, the Company recently negotiated a $35 million unsecured import financing line which expires on December 31, 1987. As of June 3, 1987, the Company had standby letters of credit of approximately $32 million outstanding under this line.

The "Risk Factors" section also included cautionary statements regarding WOW's internal controls:

**Systems and Control Procedures Requirements.** The Company's business has grown dramatically in the last year, and

the Company's development of its management information system and other systems and control procedures has at times lagged behind its growth. While the Company continues to upgrade its systems, procedures and controls to meet the demands of its expansion, there can be no assurance that the Company can successfully implement these enhancements or that these enhancements will keep pace with growth.

### 2. The Market's Knowledge of WOW's Business Risks

There is substantial evidence that by the time of the Debenture offering, WOW's financial difficulties were widely known to the market. Plaintiffs are relying on a fraud on the market theory in this case. Thus, in addition to overcoming the bespeaks caution doctrine, Plaintiffs must show that a particular statement or omission made the Prospectus misleading in the light of all the information known to the market. *See Convergent Technologies*, 948 F.2d at 512.

Two prominent rating agencies, Moody's and Standard and Poor's, rated the debentures as "below investment grade" securities. Moody's rated the bonds B3, their lowest possible B rating. Moody's states that "[b]onds which are rated B generally lack the characteristics of a desirable investment. Assurance of interest and principal payments over any long period of time may be small." Standard and Poor's rated the bonds B, which they define as:

on balance, predominately speculative with respect to the issuer's capacity to pay interest and repay principal in accordance with the terms of the obligation.... While such bonds will likely have some quality and protective characteristics, these are outweighed by large uncertainties or major risk exposures to adverse conditions.

In other words, the major rating agencies classified these debentures as "junk bonds." That this fact was widely disseminated throughout the market is reflected by the 9%

interest rate for the debentures, which was substantially higher than the market rate for lower risk securities.

Since WOW was widely considered in the marketplace to be a risky investment, Plaintiffs' allegations that statements in or omissions from the Debenture Prospectus were misleading deserve especially careful scrutiny by this court.

### 3. Plaintiffs' Allegations and Evidence
#### (a.) Alleged Errors in the Financial Statements

█ Plaintiffs allege numerous errors in the financial statements for 1987,[10] included in the back pages of the Debenture Prospectus. These financial statements were prepared and certified by Deloitte. Plaintiffs contend that the financial statements are erroneous because Deloitte improperly recognized revenue on a number of WOW's transactions.

Even if this were the case, though, every defendant except Deloitte is entitled by statute to rely on Deloitte's expertise on accounting issues. Section 11(b)(3)(C) provides a defense to liability under Section 11 for statements certified by an expert where the defendant "had no reasonable grounds to believe and did not believe ... that the statements therein were untrue." 15 U.S.C. § 77k(b)(3)(C). Here, Plaintiffs have admitted that WOW's management made full disclosure to Deloitte of all relevant information regarding the questioned transactions. It was Deloitte alone that made the decision to recognize the revenue.

Also, the issues are enormously complex on the question of whether Deloitte's recognition of revenues was in accordance with the standards of the accounting profession. The parties have generated well over 100 pages of conflicting expert testimony on these issues alone. It is absurd in these circumstances for Plaintiffs to suggest that the other defendants, who are not accountants, possibly could have known of any mistake by Deloitte. Therefore, even if there are errors in the financial statements, no defendant except De-

---

10. Plaintiffs allege that there were errors in the 1986 financial statements as well, but they have produced no specific evidence on this issue. Ac-

cordingly, the court holds that there are no errors in the 1986 financial statements in either the Debenture Prospectus or the IPO Prospectus.

loitte can be liable under Section 11 on that basis.[11]

### (b.) Price Protection

 Plaintiffs argue that the Debenture Prospectus was misleading because it did not disclose that WOW would offer "price protection" to its customers. According to Plaintiffs, WOW had a practice of crediting a customer's account if WOW dropped the price after making a sale to that customer. Plaintiffs claim that WOW was forced to take a write-down of $93 million in 1987, after the debenture offering, due to price protection.

The evidence shows, however, that WOW did not engage in any price protection prior to October, 1987, when it was forced to reduce the prices for its major product lines. There is no evidence that, at the time of the Debenture offering, WOW's management could have foreseen that WOW would have to reduce its prices to such an extent. Thus, the alleged practice of price protection did not pose a foreseeable risk to WOW's investors at the time of the debenture offering, so WOW had no duty to disclose it.

### (c.) Alleged Collapse in Sales

The parties do not dispute that WOW's sales of its major product lines, Lazer Tag in particular, decreased dramatically in late 1987. Plaintiffs argue, though, that this decrease was already occurring at the time of the Debenture offering, and that this fact should have been disclosed in the Debenture Prospectus.

 Plaintiffs contend that the Debenture Prospectus should have disclosed that WOW's sales of Lazer Tag for April and May of 1987 were below plan. However, this "plan" is not material. A company has no duty to disclose its internal projections. *Convergent Technologies,* 948 F.2d at 516.

The only question for the court is whether, at the time of the Debenture offering, Lazer Tag sales were declining so dramatically that WOW was required to disclose it in the Debenture Prospectus.

The Officer Defendants have submitted testimony that they believed the decline in Lazer Tag sales to be due to the normal seasonality of toy sales, which was adequately disclosed in the Debenture Prospectus. The Officer Defendants also offer testimony that they believed sales of Lazer Tag would increase by the Christmas season, which was reasonable given that Lazer Tag was a best selling toy during the prior Christmas season.

Plaintiffs submit no admissible evidence to show that WOW's sales had decreased so dramatically at the time of the Debenture offering that WOW's management could have known about, and thus would have had a duty to disclose, the impending collapse of Lazer Tag sales.[12] Plaintiffs cannot use the benefit of 20–20 hindsight to turn management's business judgment into securities fraud.

### (d.) Internal Controls

 Plaintiffs argue that the Debenture Prospectus was misleading for failing to disclose that WOW's internal control systems were facing serious problems. Plaintiffs ignore the fact the Prospectus included an express disclaimer that "there can be no assurances" that WOW's existing internal controls would continue to be adequate given the rapid pace at which the company was growing. The Prospectus made no predictions to the contrary. Thus, the Prospectus adequately bespoke caution regarding this potential risk to WOW's investors. As a matter of law, Plaintiffs cannot have been misled.

---

11. The court discusses Deloitte's liability for the financial statements separately. *See infra* part IV.C.4.

12. Plaintiffs submit the declaration of John G. Forsythe, WOW's Credit and Collections Manager. Forsythe testifies that based on his conversations with WOW's customers, he knew that Lazer Tag sales were very poor. However, Forsythe had no responsibility for WOW's sales, so he has

no personal knowledge of this fact and could not testify to it at trial. If he were testify to the fact that various retailers told him sales were poor, it would be inadmissible hearsay. Thus, none of Forsythe's testimony about Lazer Tag sales would be admissible at trial, and it is not considered by the court in deciding these summary judgment motions.

*(e.) Alleged Misstatement Concerning WOW's Continued Liquidity*

■ Plaintiffs claim that WOW's prediction that it could meet its capital needs until the end of March, 1988 was misleading, given the fact that WOW filed for bankruptcy in December, 1987. However, the disclosures in the Debenture Prospectus cited by the court, *supra* IV.C.1., clearly bespoke caution on the serious risks WOW's liquidity crisis posed to investors. The Debenture Prospectus disclosed that WOW's existing credit lines were extended nearly to the limit, that WOW's receivables had never been sufficient to meet WOW's capital requirements, and that an unforseen decline in demand would seriously affect the company. Plaintiffs are not entitled to an inference that they were misled in the face of these disclosures. Indeed, if courts were to allow plaintiffs in securities fraud cases to survive summary judgment in the face of disclosures this detailed and specific, there would be no point for companies to disclose risks at all. It is not the function of the securities laws to provide investors with insurance against disclosed risks.

*(f.) Summary*

To summarize, none of the defendants, with the possible exception of Deloitte, can be held liable under Section 11 for the Debenture Prospectus. Putting aside the issue of alleged errors in the 1987 financial statements, this court holds that there are no statements in, or omissions from, the Debenture Prospectus that would give rise to an inference that any part of the document was false or misleading. Summary judgment therefore is appropriate in favor of all defendants except Deloitte on this portion of Plaintiffs' claim.

*4. Deloitte's Section 11 Liability for Alleged Errors in the 1987 Financial Statements*

■ Plaintiffs allege that Deloitte erroneously recognized revenues on certain of WOW's significant transactions in fiscal 1987. According to Plaintiffs, this makes false or misleading the 1987 financial statements included in the Debenture Prospectus, which were certified by Deloitte.

Deloitte does not concede that it made any accounting errors in recognizing revenue on the questioned transactions. As mentioned above, this issue is the subject of an extensive battle of experts between Deloitte's accountants and Plaintiffs' expert witness. However, Deloitte alternatively seeks summary judgment on Plaintiffs' Section 11 claim based on two affirmative defenses. First, Deloitte asserts that it exercised "due diligence" in investigating the questioned transactions, so it is not liable even if its recognition of revenue was erroneous. Second, Deloitte contends that it is not liable because Plaintiffs' losses were not caused by its alleged misstatements.

As is set forth below, this court believes that Deloitte's "loss causation" defense entitles it to summary judgment. Therefore, the court does not reach the issues of whether the financial statements are erroneous or whether Deloitte is entitled to a due diligence defense.

Damages for a Section 11 violation are measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed. *See* 15 U.S.C. § 77k (e). Section 11(e), however, provides that:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is being asserted, not being true ... such portion or all of such damages shall not be recoverable.

*Id.* The defendant has the burden of proof on this defense. *Id.* Though it has been recognized by courts as a "heavy burden," it is not insurmountable, and courts have awarded summary judgment to the defendant in appropriate cases. *See In re Fortune Systems Securities Litigation*, 680 F.Supp. 1360, 1364–65 (N.D.Cal.1987).

This is such a case. It is obvious to any investor that WOW's securities declined in value because the company was barely liquid and faced declining sales for its products, not because its financial statements may have

been in error. Plaintiffs have absolutely no evidence to show that any part of the Debentures' decline in value was caused by Deloitte's alleged accounting errors. There was no disclosure of these errors (if indeed there were any errors) to the public at any time before this lawsuit was initiated. Since the marketplace never knew of any alleged accounting errors, the alleged errors cannot be said to have had any effect on the Debentures' market value.

Plaintiffs try to escape this inevitable conclusion by arguing that they purchased the debentures at an artificially high price because the market was misinformed by the erroneous financial statements. Thus, Plaintiffs contend, they have sustained damage caused by Deloitte's alleged errors. This argument, though true in theory, mistakes the relevance of transaction causation, as opposed to loss causation, in Section 11 claims. Transaction causation is inferred from a showing either that the plaintiffs would not have purchased the security but for defendant's misrepresentation, or that they would have purchased it at a lower price. Transaction causation is relevant to claims under other securities laws, in particular Rule 10b–5.

Congress, however, expressly chose a different measure of damages for Section 11 violations. Damages for a Section 11 violation are simply the difference between the price at which the plaintiff purchased the security and the price on the day it was sold. 15 U.S.C. § 77k (e). Transaction causation is plainly irrelevant under this statutory formula.

Moreover, it is clear that the defense provided for in Section 11(e) addresses loss causation and not transaction causation. As the court in *Fortune Systems* held in applying Section 11(e), "[w]hen a portion of the plaintiff's loss is due to an independent intervening cause, such as a decline in the stock market ... the defendant cannot be held liable for that portion of the plaintiff's loss." 680 F.Supp. at 1365 (quotations omitted).

Congress simply did not intend that those who violate Section 11 must insure investors against all possible business risks. *See id.*

Absent any showing of fraudulent intent, it would be extremely unjust to subject a defendant such as Deloitte to full liability for the collapse of a business merely because it may have made some accounting mistakes. Thus, for the above reasons, summary judgment is granted in favor of Deloitte on its loss causation defense. Deloitte is not liable under Section 11, as a matter of law, for any errors in the 1987 financial statements.

## V. PLAINTIFFS' SECTION 12(2) CLAIMS

■ Plaintiffs' Seventh and Eighth Claims for Relief allege that the Underwriter Defendants violated Section 12(2) of the Securities Act of 1933. Section 12(2) provides that "[a]ny person who offers or sells a security ... by the means of a prospectus ... which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security." 15 U.S.C. § 77l(2).

The analysis this court applied to Plaintiffs' Section 11 claims, *supra* part IV., applies equally to Plaintiffs' claims under Section 12(2). This court repeats its holding that there are no misleading statements in or material omissions from the prospectuses, aside from possible errors in the 1987 financial statements prepared by Deloitte in the Debenture Prospectus.[13]

Regarding the alleged errors in the 1987 financial statements, only Smith Barney is named as a defendant in Plaintiffs Section 12(2) claim on the Debenture Prospectus. Section 12(2) provides a defense for a defendant who proves that "he did not know, and in the exercise of reasonable care could not have known" of the alleged error. *Id.* The financial statements, as mentioned above, were "expertised" by Deloitte, and Smith

---

**13.** The court emphasizes again that it is far from certain that there are any errors in the financial statements prepared by Deloitte. The court simply is conserving judicial resources by assuming *arguendo* that the statements are in error, because summary judgment for defendants is clearly appropriate on other grounds.

Barney had no duty to independently repeat the investigation done by Deloitte. Even so, as part of Smith Barney's "due diligence" inquiry, Smith Barney specifically sought and received assurances from Deloitte on the facts that supported Deloitte's decision to recognize revenue on the questioned transactions. Thus, Smith Barney clearly exercised reasonable care, and it did not have any reason to know that there were any errors in the financial statements.

For the above reasons, the Underwriter Defendants are entitled to summary judgment on Plaintiffs' Section 12(2) claims.

## VI. PLAINTIFFS' RULE 10b–5 CLAIMS

■ Plaintiffs allege claims against all defendants for violations of Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder. Section 10(b) provides in relevant part that "it shall be unlawful for any person ... to use or employ, in connection with the purchase of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j (b). Securities and Exchange Commission Rule 10b–5, which implements Section 10(b), provides:

It shall be unlawful for any person ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)(5).

In addition, the Supreme Court has held that for a defendant to be liable under Rule 10b–5, there must be a showing of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

*Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 1382 & n. 12, 47 L.Ed.2d 668 (1976). The Ninth Circuit has held that scienter can be proved by a showing of recklessness on the part of the defendant. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). For the purposes of Rule 10b–5, reckless conduct is defined as conduct

involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977)).

■ It is beyond dispute that summary judgment can be granted on the issue of scienter in an appropriate case. *In re Apple Computer Securities Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Plaintiffs must offer more than conclusory allegations, and if the defendants present evidence establishing a lack of scienter, Plaintiffs must produce some affirmative evidence to avoid summary judgment. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984). Furthermore, where the evidence presents a pattern of conduct inconsistent with scienter, the non-movant bears a heavy burden in defeating summary judgment with inferences drawn from circumstantial evidence. *See Apple Computer,* 886 F.2d at 1118 (no inference of scienter where "overall pattern of conduct" inconsistent with bad faith); *see also In re Software Toolworks, Inc. Securities Litig.,* 789 F.Supp. 1489, 1498–1500 (N.D.Cal.1992) (same).

Plaintiffs base their claims under Rule 10b–5 primarily on the alleged misstatements or omissions in their prospectuses that the court addressed in part IV, *supra.* The analysis this court applied to Plaintiffs' Section 11 claims also applies to Plaintiffs' Rule 10b–5 claims, to the extent the Rule 10b–5 claims

are based on the prospectuses. It bears repeating, then, that as a matter of law, there are no misrepresentations in, or material omissions from, the IPO Prospectus. Also, as a matter of law, there are no misleading statements in, or material omissions from, the Debenture Prospectus, aside from possible errors by Deloitte in the 1987 financial statements.

Plaintiffs also base their Rule 10b–5 claims, though, on alleged fraudulent conduct by the defendants other than the prospectuses. Each defendant, without conceding that it engaged in any misleading conduct, moves for summary judgment on the ground that Plaintiffs cannot show scienter on the part of the defendants. The court addresses the evidence on scienter as to each defendant in turn.

## A. *The Officer Defendants*

Aside from the prospectuses, Plaintiffs allege in conclusory fashion that the Officer Defendants violated Rule 10b–5 by misleading "press releases, filings with the SEC, statements to analysts, etc." The Officer Defendants overall pattern of conduct, though, rebuts any inference of knowing or reckless conduct on their part. If WOW's officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure in the prospectuses. Furthermore, if, as Plaintiffs allege, the Officers knew that WOW was heading for financial disaster, they probably would have bailed out of their substantial stock holdings. Each of the Officer Defendants, by contrast, held onto most of their WOW stock and incurred the same large losses as did the Plaintiffs themselves. Stein did not sell any of his holdings until after WOW filed for bankruptcy. Pezzani did not sell at all. Kingsboro sold only a small fraction of his stock, and that was pursuant to a prearranged plan developed by his financial advisor.

In addition, each of the Officer Defendants has submitted an affidavit stating that they acted in good faith regarding all of their dealings with WOW.

Plaintiffs' slim evidence of specific facts does not give rise to a inference of scienter when considered with the Officer Defendants' evidence. Plaintiffs point to statements attributed to defendant Kingsboro in the magazine *California Business* in 1986, before the class period began. Plaintiffs allege that Kingsboro's statements in the article were misleading.[14] WOW's public relations firm wished to reprint and circulate the magazine article, which was largely favorable to WOW. WOW's management, however, decided not to do so after consultation with their attorneys. Plaintiffs argue that the fact that the statements in the article were never formally corrected is probative of scienter on the part of the officers, even though the Officer Defendants do not concede that the statements were false, and Plaintiffs have no evidence on this point.

Plaintiffs, however, neglect to mention three key facts that rebut any inference of scienter. First, even if the statements in the article were false, WOW decided against reprinting the article. Second, the IPO Prospectus provided substantial risk disclosure that would have overwhelmed any misleading effect the magazine article could have had on the market. If the Officer Defendants were attempting to mislead the market, they would not have provided such ample risk disclosure to investors. Third, Plaintiffs do not have any evidence to show that Kingsboro knew or could have known that the statements attributed to him in the article were false.

Plaintiffs also point to a statement Kingsboro made to the press in connection with WOW's earnings report for the fourth quarter of fiscal 1987. Kingsboro attributed the drop in WOW's earnings to "substantial investment in engineering and product development." Plaintiffs contend that it was due in fact to decreased sales. However, WOW did actually invest substantially in engineering and product development, and Plaintiffs have no evidence to suggest that Kingsboro's statement was false.

---

**14.** Plaintiffs do not submit any evidence showing that any of the statements were misleading. For that matter, Plaintiffs do not even point out to the court exactly which statements in the article they claim are misleading.

Plaintiffs' evidence shows only that they will grasp wildly at any straw in hope of saving their securities fraud claims against the Officer Defendants. There is no evidence of scienter on the part of any of the Officer Defendants. They are entitled to summary judgment on Plaintiffs' Rule 10b–5 claims.

### B. *The Underwriter Defendants*

Plaintiffs' Rule 10b–5 claims against the Underwriter Defendants are based almost exclusively on the prospectuses, which, as the court discussed at *supra* part IV., do not support any inference that Plaintiffs were misled by these defendants.

Plaintiffs' claim against Dean Witter is based entirely on the IPO Prospectus. Thus, Dean Witter is awarded summary judgment on Plaintiffs Rule 10b–5 claim.

 Aside from the prospectuses, the only alleged fraudulent conduct on the part of Smith Barney is an August 14, 1987 analyst report prepared by Stephen Handley of Smith Barney which recommended WOW stock to investors. Even though this report actually downgraded Smith Barney's earlier recommendation on WOW from "long term buy" to "accumulate," Plaintiffs contend that it was misleading. However, an analyst report containing opinions made in good faith is *per se* not made with scienter. *Software Toolworks*, 789 F.Supp. at 1501. Plaintiffs do not challenge the good faith basis for Handley's recommendation. Thus, summary judgment is awarded to Smith Barney on Plaintiffs' Rule 10b–5 claims.

### C. *Deloitte*

 As mentioned above, Deloitte was responsible for the 1987 financial statements that appear in the Debenture Prospectus. Plaintiffs have presented evidence, in the form of the declaration of an expert witness, that Deloitte erroneously recognized revenue on certain of WOW's transactions, which according to Plaintiffs makes the financial statements misleading under Rule 10b–5. This evidence creates a genuine issue of fact on this element of Plaintiffs' Rule 10b–5 claim.

To survive summary judgment, however, Plaintiffs also must come forward with evidence from which a jury could infer scienter on the part of Deloitte. Even assuming that Deloitte was incorrect in recognizing the revenues, Deloitte has not violated Rule 10b–5 unless it acted knowingly or recklessly in erroneously recognizing the revenues.

Deloitte has submitted evidence showing that it extensively investigated, carefully addressed, reasonably resolved, and thoroughly documented every transaction where Plaintiffs allege revenue was improperly recognized. Also, Deloitte submits the declarations of its accountants that recognition of the revenue was proper in accordance with Generally Accepted Accounting Principles ("GAAP"). The thoroughness of Deloitte's investigation into the transactions in question certainly meets Deloitte's burden of showing that there is no genuine issue of fact on the issue of scienter.

Plaintiffs respond to Deloitte's evidence with the declaration of Albert Rossi, an expert witness according to Plaintiffs. Rossi's testimony, in substance, is that for everything Deloitte's accountants did, he would have done more, and that in his opinion, the revenues were improperly recognized under GAAP. Rossi concludes that "[t]he danger that Deloitte's audit opinion and the financial statements which Deloitte audited would mislead investors was so obvious that in my opinion, Deloitte must have been aware of it."

 As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case. *Apple Computer*, 886 F.2d at 1116. "However, where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert.'" *Id.* An expert's conclusory allegations that a defendant acted with scienter are insufficient to defeat summary judgment where the record clearly rebuts any inference of bad faith. *See Software Toolworks*, 789 F.Supp. at 1504 n. 30.

Here, Rossi's conclusory opinion that Deloitte's accountants had a mental state of knowledge or recklessness is not enough to allow a jury to infer scienter. Rossi's opinion

is not based on specific facts that shed light on the mental state of Deloitte's auditors, and from which the jury on their own could infer scienter. Rather, Rossi is drawing his conclusion based on a record that conclusively rebuts any inference of scienter. *See Apple Computer*, 886 F.2d at 1118 (no inference of scienter where overall pattern of conduct inconsistent with bad faith). As such, Rossi's opinion is more probative of Plaintiffs' desperation to keep Deloitte, a "deep pocket," involved in this lawsuit than it is on the issue of whether Deloitte acted with scienter. Rossi's declaration does not help Plaintiffs survive Deloitte's motion for summary judgment.[15]

The court holds that as a matter of law Plaintiffs cannot establish scienter on the part of Deloitte. Deloitte is awarded summary judgment on Plaintiffs' Rule 10b-5 claims.

### D. *Plaintiffs' Insider Trading Claims*

The only colorable Rule 10b-5 claim that Plaintiffs allege against defendants Howenstein, Margolis, Abercrombie, Robinson, and WOW Shares Partnership is for insider trading.[16] Though the Ninth Circuit has not expressly recognized a private right of action under Rule 10b-5 for insider trading, other courts have implied this right. *See, e.g., Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94-95 (2d Cir.1981).

Plaintiffs assert that since these defendants sold some of their shares in WOW prior to WOW's financial collapse, they must have known of some information, not already known to the market, that signalled WOW's imminent doom. Plaintiffs "evidence," though, consists of mere speculation and conclusory allegations. For example, according to Plaintiffs, Howenstein, as a director of WOW, must have had knowledge of inside information. Plaintiffs allege, without any proof, that Howenstein sold some of his shares of WOW stock based on information not known to the market, as opposed to information disclosed by WOW.

Furthermore, Howenstein was Abercrombie's business manager, so Howenstein had many opportunities where he could have tipped Abercrombie on inside information. Since Abercrombie later sold a portion of her stock, she too must be guilty of insider trading, according to Plaintiffs. Plaintiffs also point out to the court that the president of Robinson met with Howenstein on numerous occasions, as if this was some sort of smoking gun that implicates Robinson in this alleged scheme of insider trading.

Plaintiffs follow a similar line of reasoning regarding Margolis and WOW Shares Partnership. Margolis, a director of WOW, had access to inside information. Again, without any proof, Plaintiffs allege that when Margolis sold a portion of his shares, it was based on this inside information. Since Margolis was a partner in WOW Shares Partnership, he had the opportunity to tip the other partners on inside information. WOW Shares Partnership sold some of its shares. Thus, according to Plaintiffs, illegal insider trading

---

**15.** The court wishes to make clear that it is not striking Rossi's declaration, but granting summary judgment notwithstanding it.

Interestingly, this is not the first time that a district court has awarded summary judgment to an auditor on the scienter issue in the face of a declaration by Rossi. In *Software Toolworks*, the plaintiffs' asserted a Rule 10b-5 claim against Deloitte. After finding nothing in the record indicating scienter, the court awarded summary judgment in favor of Deloitte, even though an expert had opined that Deloitte had acted knowingly or recklessly. *See Software Toolworks*, 789 F.Supp. at 1504-10. Deloitte has informed the court that Rossi was the expert whose testimony was rebuffed by the court in that case.

**16.** Plaintiffs also allege that Howenstein and Margolis violated Rule 10b-5 in connection with

the IPO Prospectus and the Debenture Prospectus, but the court has held that none of the statements in the prospectuses for which these defendants would be responsible are actionable under Rule 10b-5. *See supra* part IV.

Plaintiffs also allege, as a separate basis for their Rule 10b-5 claim, that Howenstein and Margolis violated Rule 10b-5 by "misrepresentations and omissions during the class period." Nowhere in their memorandums submitted in opposition to these motions do Plaintiffs specify what these alleged misrepresentations or omissions were. The court assumes that this is because there is no evidence to support these allegations. Thus, this portion of Plaintiffs' claim presents no genuine issues of fact, and summary judgment is appropriate.

by WOW Shares Partnership also must have occurred.

Plaintiffs contend that their evidence is enough to survive summary judgment on their claims of insider trading. The evidence, though, shows only that the opportunity for insider trading existed. Plaintiffs cannot survive summary judgment merely by showing that the opportunity existed. Plaintiffs must point out with specificity, and present some proof of, the material nonpublic information that was allegedly traded upon. In this case, after years of discovery, Plaintiffs cannot point to any bit of information traded on by these defendants that was not already known to the market. This speaks to the merits of their claims.

Moreover, even if there were some evidence that these defendants' sales of WOW stock were based on inside information, Plaintiffs have submitted no evidence from which the jury could infer scienter. "Insider trading in suspicious amounts or at suspicious times is probative of scienter." *Apple Computer*, 886 F.2d at 1117. But in this case, when one considers the amounts traded, Plaintiffs' claims appear fantastic. These defendants sold only a small portion of their holdings in WOW. Of course, an insider trader may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforseen or to obscure the insider trading from the SEC. Here, however, Plaintiffs' allegation is essentially that these defendants possessed inside information on WOW's imminent collapse, so one would expect that they would have sold a good proportion of their holdings.

On the contrary, most of these defendants sold only a minuscule fraction of their holdings in WOW,[17] and ended up reaping the same large losses as did Plaintiffs when WOW collapsed. For example, Howenstein sold only 50,000 shares before WOW's bankruptcy, though he possessed over 970,000. Abercrombie sold only about fourteen percent of her shares, holding onto approximately 2,870,000 shares that became essentially worthless after WOW's bankruptcy. Some of the partners in WOW Shares Partnership who supposedly possessed inside information did not sell at all.

In sum, with this evidence, no reasonable jury could find that insider trading had occurred, or that these defendants acted with scienter. Plaintiffs' Rule 10b–5 claims against Howenstein, Margolis, Abercrombie, WOW Shares Partnership, and Robinson are without merit. Summary judgment is granted in favor of the defendants on these claims.

## VII. PLAINTIFFS' CLAIMS OF SECONDARY LIABILITY

Plaintiffs' Second and Ninth Claims for Relief allege claims of secondary liability under Section 20 of the Exchange Act, 15 U.S.C. § 78t (a), and Section 15 of the Securities Act, 15 U.S.C. § 77o, respectively. These sections provide that any defendant who controls a person liable under the securities laws is jointly and severally liable to the same extent as the controlled person.[18]

In this case, the court has held that none of the defendants is liable under the federal securities laws. There being no primary liability, there can be no secondary liability. Thus, the court grants summary judgment for defendants on these claims.

**17.** Robinson was the only defendant that sold a majority of its shares in WOW. Robinson, however, has submitted unchallenged evidence that it sold its shares because it faced a pressing need to service a huge debt incurred from overinvesting in real estate. Moreover, Robinson sold its stock according to a prearranged plan that conformed to SEC regulations. This rebuts any inference of scienter on the part of Robinson.

**18.** Section 20 of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally." 15 U.S.C. § 78t (a). This section creates joint and several liability for Rule 10b–5 violations.

Section 20 of the Securities Act provides that "[e]very person who ... controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally." 15 U.S.C. § 77o. This section creates joint and several liability for violations of Section 11 and Section 12(b) of the Securities Act.

## VIII. PLAINTIFFS' STATE LAW CLAIMS

Plaintiffs' Third and Fourth Claims for Relief allege claims for state law fraud and negligent misrepresentation, respectively. Because the court intends to dismiss the federal claims in this case, it declines to further exercise its supplemental jurisdiction over Plaintiffs' state law claims.[19]

## IX. CONCLUSION

When a company fails, it does not automatically mean that a violation of the securities laws has occurred. There are a number of risks involved whenever one invests in any company. The function of the federal securities laws is to provide investors with full disclosure of these risks, and to prevent fraud. The securities laws do not insulate investors against stock downturns which are caused by events that were not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities.

In this case, WOW's investors took a gamble, as do all investors. They lost. Holders of shares and Debentures knew that WOW was not a diversified company. Its success was based on only two major products, Teddy Ruxpin and Lazer Tag. Also, WOW's precarious cash position was not concealed from these investors; it was adequately revealed in both the IPO Prospectus and the Debenture Prospectus. It was obvious to any reasonable investor that if either of WOW's two products were to lose favor with consumers, the company would be devastated. Though WOW's failure was extraordinary, the material risks involved in investing in WOW were adequately disclosed to potential investors.

Plaintiffs have submitted hundreds of pages to this court in an effort to create a genuine issue of fact. Using tortured reasoning, convolution of the issues, and the benefit of hindsight, they point to the most innocuous of optimistic language, and the most immaterial of omitted facts, and claim

that they were somehow misled as to the nature of their investment. The court has thoroughly reviewed the record, and it concludes that there is no issue on Plaintiffs' claims under the federal securities laws that can be submitted to the jury. For the reasons set forth above, no defendant is liable for any statement in, or omission from, either the IPO Prospectus or the Debenture Prospectus. Moreover, there is insufficient evidence, as a matter of law, for the jury to find intent to deceive or defraud on the part of any defendant in connection with WOW's securities offerings.

The defendants' motions for summary judgment are GRANTED. This action is hereby DISMISSED.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the order entered by the court herein, summary judgment is GRANTED on Plaintiffs' federal claims in favor of the following defendants:

Angelo M. Pezzani; Donald D. Kingsboro; Richard B. Stein; John B. Howenstein; Barry H. Margolis; Deloitte & Touche; Smith Barney, Harris Upham & Co., Inc.; Dean Witter Reynolds, Inc.; Josephine E. Abercrombie; Worlds of Wonder Shares Partnership; and Robinson Interests, Inc.

Plaintiffs' state law claims are hereby DISMISSED.

IT IS SO ORDERED.

## ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER UNDER FED.R.CIV.P. 59; 60

## I. INTRODUCTION

This action arises out of the collapse of Worlds of Wonder, Inc. ("WOW"), a high-technology toy company. Plaintiffs, a class

---

19. "The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3).

of purchasers of WOW stock and debentures, brought an action under the federal securities laws against various individuals and firms involved in WOW's securities offerings. On January 20, 1993, this court entered an Order granting summary judgment in favor of every defendant (the "Order"). See page 850. Plaintiffs now move the court to reconsider its Order.[1]

## II. STANDARD OF REVIEW ON MOTIONS TO RECONSIDER

This court has the inherent power to modify or change its orders to correct a mistake or error. 6A *Moore's Federal Practice* ¶ 59.07 (1991). However, a motion for reconsideration is not the proper vehicle for revisiting issues that were decided, *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991), or for a "recapitulation of the cases and arguments considered by the court before rendering its original decision," *Starr v. JCI Data Processing Inc.*, 767 F.Supp. 633, 635 (D.N.J.1991). The party moving for reconsideration must show more than a disagreement with the court's decision; the court should not grant the motion unless there is a need to correct a clear error of law or prevent manifest injustice. *See Kern–Tulare Water District v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds*, 828 F.2d 514, *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988).

## III. DISCUSSION

Plaintiffs filed two separate motions to reconsider. Plaintiffs filed a "Motion for Reconsideration and Alteration and Amendment of Judgment in Favor of Officer and Director Defendants and Defendant Smith Barney, Harris Upham & Co., Inc." In this motion, plaintiffs ask the court to reopen the case to reconsider issues that the court already decided. Specifically, they ask the court to reconsider its application of the "bespeaks caution" doctrine, and to reevaluate each of plaintiffs' contentions that certain statements in or omissions from WOW's prospectuses misled investors. This motion presents no new issues of law or fact. Therefore, the court denies this motion in its entirety.

Plaintiffs also filed a "Motion for Reconsideration and Alteration and Amendment of Judgment in Favor of Defendant Deloitte and Touche." Again, this motion presents no newly discovered facts or law showing that the court's Order was in error. Plaintiffs simply challenge the court's analysis. However, the court believes that some clarification of its Order would be helpful to the parties.

### A. The "Loss Causation" Defense of Section 11(e)

To recall, Deloitte & Touche ("Deloitte") was WOW's independent auditing firm. Deloitte prepared and certified the financial statements WOW included in the prospectus for its debenture offering (the "Debenture Prospectus"). WOW's debentures greatly decreased in value after WOW defaulted on its first interest payment to debenture holders and declared bankruptcy.

The plaintiff subclass of debenture holders claims it is entitled to damages under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. According to plaintiffs, the financial statements in the Debenture Prospectus overstated WOW's net revenues for fiscal 1987 by 14.3%[2]. Deloitte allegedly violated Section 11 by allowing this misleading information to appear in the Debenture Prospectus with Deloitte's certification.

Section 11(e) allows a prevailing plaintiff "to recover such damages as shall represent the difference between the amount paid for the security ... and (1) the value thereof at the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit...." 15 U.S.C. § 77k(e). However, Section 11(e) allows a defendant to avoid liability by prov-

---

1. Plaintiffs filed their notice of appeal to the Ninth Circuit Court of Appeals on February 18, 1993.

2. In their opposition to Deloitte's motion for summary judgment, Plaintiffs submitted the testimony of an expert witness that Deloitte erroneously recognized revenue on some of WOW's major transactions in fiscal 1987. The 14.3% figure is supplied by plaintiffs' counsel based on this expert's declaration.

ing that the decline in the price of the security resulted from factors "other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is being asserted, not being true." *Id.*

This court granted summary judgment to Deloitte based on its Section 11(e) "loss causation" defense.[3] (Order at 41.) The court held that the market price of WOW's debentures declined for reasons other than the alleged overstatement of revenues by Deloitte. The court found that Deloitte's alleged errors never were disclosed to the public. Since there was no public disclosure of the fact that WOW's 1987 revenues may have been overstated, the market could not possibly have reacted. (*See* Order at 866–67.) The court found instead that the debentures declined in value because the market discovered that WOW was barely liquid, and faced increasing difficulties in selling its products. (Order at 866–67.)

Plaintiffs contend, as they did in opposing Deloitte's motion for summary judgment, that they purchased the debentures at an artificially high price due to the market's reliance on Deloitte's alleged errors. Therefore, when WOW collapsed, plaintiffs suffered a greater loss than they otherwise would have suffered. Plaintiffs claim that this loss is recoverable under Section 11.

The argument pressed by plaintiffs is best illustrated by the district court in *In re Washington Public Power Supply System Securities Litigation*, 650 F.Supp. 1346 (W.D.Wash.1986) [hereinafter *Washington Power*].[4] In that case, the court proposed the following hypothetical: An investor buys stock in a shipping venture which owns one single vessel. The prospectus overstates the amount of capacity in the boat. However, the prospectus discloses truthfully that the vessel will not be insured. Suppose a storm destroys the vessel, and the investor's stock

becomes worthless. What damages would the investor be entitled to? *See id.* at 1353–54.

The court in *Washington Power* made the following observations:

> The misrepresentation may not be the cause of the loss; it is however, the cause of damage. By misrepresenting the capacity in the ship, the investor was induced to pay a certain price for stock in the venture. As a result of the misrepresentation, the investor paid more for the stock than it was worth. When the ship sank, the entire investment was lost. The investor, however, was injured by more than the true value of the investment because he paid an inflated price for the stock. The damages thus consist of two components: the value lost due to the casualty and the amount lost because he overpaid for the stock.

*Id.* The court concluded that the amount lost due to overpayment would be recoverable in an action under Rule 10b–5.[5] *Id.* Plaintiffs argue that under this reasoning, even if WOW's collapse is wholly unrelated to Deloitte's alleged errors, they are entitled to damages measured by the difference between the price they paid for the debentures and their "true value" at the time of purchase, that is, the price the debentures would have commanded from the market in the absence of Deloitte's alleged misstatement of revenues. Plaintiffs now move the court to reconsider this portion of its Order.

To understand why Deloitte's "loss causation" defense of Section 11(e) applies in this case, one must consider the "fraud on the market" theory, on which plaintiffs rely. In a fraud on the market case, the plaintiffs do not have to prove individual reliance on the allegedly misleading information. Instead, the plaintiffs' claim that the misleading information was immediately disseminated throughout the market by those persons who

---

3. The court expressly did not reach the merits of Deloitte's "due diligence" defense.

4. This case was not brought to the court's attention by either Plaintiffs or Deloitte before its Order was entered.

5. Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10(b)(5), is promulgated pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). Rule 10b–5 creates a private right of action to remedy fraudulent conduct in connection with a securities offering.

did rely on it, thereby increasing the market price of the security. It necessarily follows under this theory that plaintiffs suffer no cognizable loss from the misleading information until the market learns of the falsehood of the information and adjusts accordingly. Until the false or misleading nature of the information is publicly disclosed, the price of the security remains inflated. Investors could sell their securities at any time before disclosure without suffering a loss.

It is helpful to consider a variation of the hypothetical set forth in *Washington Power* for illustration. Suppose the investor paid $100 for his stock in the shipping venture. This was the market price at the time of purchase. But unknown to the market, the boat's capacity is considerably less than was disclosed in the prospectus. If the true capacity were disclosed, the market price of the investor's shares would have been $75. Therefore, the investor's stock was overpriced by $25. Now suppose the boat is damaged in a storm, but does not sink. The market would react, and the price of the stock would decline, to perhaps $50 (to choose an arbitrary number). If, however, the market has not yet learned the true capacity of the vessel, the stock is still overpriced by $25 (assuming all other variables affecting the shipping venture remain constant).

In the above example, the misleading prospectus did not cause the loss suffered by the investor. Under section 11(e), the defendant responsible for the error in the prospectus can prove that the investor's loss was caused by the storm, not by the misleading information about the boat's capacity. The defendant would be entitled to summary judgment.

Now assume instead that one day after the investor purchases the stock, the boat sinks in a storm, and the loss is total. This reduces the market value of the investor's stock to $0. Upon inspecting the wreckage, the investor learns of the mistake in the

boat's capacity. He now claims he would have paid only $75 for his stock, and seeks to recover the overpayment of $25 from the person responsible for the misleading statement in the prospectus. There is no reason to change the analysis in the first example simply because the loss caused by the storm in this case is total. The storm, not the misleading prospectus, is still the direct cause of the loss. To allow recovery would convert the person responsible for the misleading information into an insurer against all possible casualties to the boat, not just those risks directly related to the defendant's misleading conduct.[6]

Thus, when plaintiffs proceed under a fraud on the market theory, the defendant is entitled to summary judgment on the loss causation defense of Section 11(e) upon an unrebutted showing that the misleading nature of the statements complained of was never revealed to the market. Indeed, this is the view of the small number of courts that have addressed this issue directly. *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 342 (2d Cir.1987); *In re Fortune Systems Sec. Litig.*, 680 F.Supp. 1360, 1368 (N.D.Cal. 1987).

Plaintiffs cite to numerous cases which, according to plaintiffs, allow the recovery of the amount overpaid by investors due to the market's reliance on false or misleading statements. *See Securities Investor Protection Corp. v. Vigman*, 908 F.2d 1461 (9th Cir.1990), *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir.1987); *Washington Power*, 650 F.Supp. 1346. These cases, however, all involve claims under Rule 10b–5 and not Section 11, and therefore are inapposite here.

It is no accident that the measures of damages for Section 11 violations and Rule 10b–5 violations are different. Rule 10b–5 is a catch-all provision that provides a remedy for any misleading conduct made in connection with the purchase or sale of securities,

---

**6.** To be fair, recovery would only be for the amount overpaid ($25) and not the full amount of the casualty ($100). To allow recovery, then, would only put the defendant in the position of a partial insurer. However, the important point is that the insurance would be for risks unrelated to the defendant's role in the securities offering. By including the "loss causation" defense in the statute Congress meant to exclude this result.

provided that the defendant possessed fraudulent intent, or scienter. The broad "loss causation" standard applied in the Rule 10b–5 cases cited by plaintiffs is judicially created to deter fraudulent conduct. The measure of damages, the difference between the price paid for the security and its "true value", is similar to the remedy provided in common law fraud cases.

By contrast, Section 11 is not a fraud provision. Section 11 applies to any misleading statements that appear in a prospectus. Section 11 does not require the plaintiff to prove fraudulent intent, or even negligence, on the part of the defendant. In order to balance the harsh, strict liability features of Section 11, Congress expressly has limited the damages to those directly caused by the defendant's misleading conduct. The remedy and the loss causation defense are provided by statute, and stand in stark contrast to the judge-made remedy for Rule 10b–5 violations.

For the above reasons, the court does not change its holding that Deloitte was entitled to summary judgment upon a showing that its alleged accounting errors never were disclosed to the market.

### B. *Whether Deloitte's Alleged Errors Were Disclosed*

 Of course, it is not necessary for Deloitte to admit publicly that it made errors in the Debenture Prospectus for the jury to find disclosure of the errors to the market. The market could have learned of Deloitte' errors indirectly through the disclosure of related information. Here, plaintiffs contend that the errors in WOW's 1987 financial statements in fact were disclosed to the market before plaintiffs filed this suit. Plaintiffs argue that WOW's public disclosure of adverse information shortly after the debenture offering clued in the market to Deloitte's alleged overstatement of WOW's fiscal 1987 revenues.

After the debenture offering, WOW publicly disclosed information that adversely affected the price of the debentures. Specifically, WOW disclosed that it ran out of cash in the middle of fiscal 1988, due in part to declining sales, and in part to inability to collect past due accounts receivable. Plaintiffs contend that the market must have learned of Deloitte's overstatement of WOW's fiscal 1987 revenues from these disclosures.

The court fails to see the logic in plaintiffs' argument. The amount of revenue posted by a company during a prior year is a number that exists only on paper to reflect total sales during that year. The amount of actual cash the company has access to at the moment is not necessarily related to its total sales in the previous year. This is a separate issue, and investors are savvy enough to look in places other than the company's statement of revenue to find out the relevant facts on the company's immediate access to cash.[7] The market would not interpret WOW's running out of cash as a signal that its revenues for the previous year were overstated.

Moreover, even if WOW's lack of access to cash was related to Deloitte's alleged mistake, the Debenture Prospectus truthfully disclosed all the relevant facts on WOW's continued liquidity elsewhere in the Debenture Prospectus. (Order at 866.) The Debenture Prospectus clearly warned that WOW's access to capital in the near future was suspect. It disclosed that WOW's existing bank credit lines were tapped nearly to the limit, and that the company would be severely damaged by an anticipated shortfall in demand. *Id.* In short, the risk that WOW would run out of cash was a risk that WOW's investors assumed when they purchased the debentures. Deloitte is not liable for the losses plaintiffs incurred when this possibility became reality.

Plaintiffs present no other evidence of any disclosure from which the market possibly could have gleaned that Deloitte's statement of WOW's fiscal 1987 revenues was in error. The court considered the merits of Deloitte's defense in its Order. Viewing the evidence in the light most favorable to the plaintiffs,

---

7. A company's liquidity, or immediate access to cash, is evidenced by factors other than total sales, such as the company's ability to collect accounts receivable and the amounts of cash available on existing bank credit lines. It is common for a company to disclose these factors in a prospectus.

this court held that "[t]here was no disclosure of [Deloitte's alleged accounting errors] to the public at any time before this lawsuit was initiated." (Order at 866–67.) Thus, as explained above, these alleged errors could not have affected the market price of WOW's debentures. Deloitte is not liable under Section 11 for any part of plaintiffs' losses.

### C. *Plaintiffs' Rule 10b–5 Claims*

This court granted summary judgment in favor of Deloitte on plaintiffs' Rule 10b–5 claim on the ground that, as a matter of law, plaintiffs' evidence did not establish scienter on the part of Deloitte. (Order at 870–71.) Plaintiffs ask the court to reconsider this holding.

Plaintiffs argue that "[t]he Order inexplicably dismisses Mr. Rossi's exhaustive, highly detailed, 81–page declaration as 'conclusory' and unaccountably disregards plaintiffs' other evidence." (Plaintiffs' Mem. at 23.) The court did not disregard any evidence presented by plaintiffs. On the contrary, it held that plaintiffs evidence, even when viewed in the light most favorable to plaintiffs, did not have enough probative value to rebut Deloitte's evidence showing a lack of scienter. Not all of plaintiffs' evidence was worthy of comment in the court's Order. Plaintiffs' motion to reconsider on this issue is denied.

As to Rossi's declaration, the number of pages submitted to the court has nothing to do with the weight the evidence is entitled to. As the court held, "Rossi's opinion is not based on specific facts that shed light on the mental state of Deloitte's auditors, and from which the jury on their own could infer scienter. Rather, Rossi is drawing his conclusion based on a record that conclusively rebuts any inference of scienter." (Order at 870–71.)

Plaintiffs' evidence and arguments on this issue have already been considered by the court. Their motion to reconsider is denied.

## IV. CONCLUSION

In accordance with the foregoing, plaintiffs' motions to reconsider the court's January 20, 1993 Order and entry of judgment are DENIED.

IT IS SO ORDERED.